## IN THE UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT

**THOMAS J. CAPANO,**
    Appellant,

          v.

**PERRY PHELPS**, Warden,
Delaware Correctional Center
and **JOSEPH R. BIDEN, III**, Attorney
General of the State of Delaware.
    Appellees.

Case No. 08-2282

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

Thomas J. Capano ("Capano"), the Appellant herein, hereby moves the Court, pursuant to FRAP 22(b)(2) and LAR 22.1, to issue a Certificate of Appealability ("COA") for the reasons and upon the authorities set forth below:

### Procedural Background

In January 1999, Capano, was convicted in the Delaware Superior Court of a single charge of First Degree Murder concerning the death of of Anne Marie Fahey ("Fahey"), the scheduling secretary of the State's then-Governor, Thomas R. Carper. Following a "penalty hearing," the Court sentenced Capano to death. See, *State v. Capano*, 1999 Del. Super. LEXIS 541. Capano's conviction and death sentence were affirmed by the Delaware Supreme Court on direct appeal *Capano v. State*, 781 A.2d 556 (Del. 2001), *cert. denied*, 536 U.S. 958 (2002) ("*Capano II*"). In a subsequent state court post-conviction proceeding, the Delaware Supreme Court vacated Capano's death sentence and remanded for a new penalty hearing. See, *Capano v. State*, 889 A.2d 968 (Del. 2006). When the State elected not to proceed with that a second penalty hearing, Capano was resentenced to life in prison without the possibility of parole.

Thereafter, Capano filed a timely petition for habeas corpus relief under 28 U.S.C. §2254. In the Habeas Petition, Capano presented three claims for relief:

(1) Under the Due Process Clause of the Fourteenth Amendment, Capano was entitled to have the jury instructed on lesser included offenses to First Degree Murder under *Beck v. Alabama*,

447 U.S. 625 (1980) and its progeny. The decision in *Capano II* that Capano was not entitled to instructions on lesser included offenses was an unreasonable application of *Beck* and its progeny (hereinafter "*Beck* Claim");

(2) The rulings in *Capano II* that the admission in evidence of Fahey's hearsay statements to her friends, relatives and psychotherapists did not violate Capano's rights under the Confrontation Clause of the Sixth Amendment and also did not violate his right to a fair trial under the Fourteenth Amendment (hereinafter "Hearsay Claim");

(3) The questioning of Capano on cross-examination concerning his pre-arrest and post-arrest silence violated his rights under the Fifth Amendment to the United States Constitution (hereinafter "*Doyle* Claim").

The Habeas Petition was denied by the District Court on April 15, 2008. *Capano v. Carroll*, 2008 U.S. Dist. LEXIS 32648 ("*Habeas Decision*"). The District Court also declined to issue a COA.[1]

## Exhaustion of Remedies[2]

The *Beck* Claim and the Hearsay Claim were presented to and decided on the merits in the state court proceedings. Therefore, Capano exhausted his state law remedies as to those claims. See, *Habeas Decision*, *23 and *33. As to the *Doyle* Claim, the District Court concluded that the claim had been procedurally defaulted in the Delaware State courts and therefore habeas review was unavailable. *Id.*, at *51-*53.[3]

## Standard for Issuance of a COA

The standard for the issuance of a COA by an appellate court is well established. As mandated by federal statute, a state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. Until a COA has been issued, federal

---

[1] A copy of the *Habeas Decision* is attached hereto as Ex. No. 1. See, *FRAP, Rule 27(a)(2)(B)(iii)*.

[2] *See, 3rd Cir. LAR 111.5(b)*.

[3] Appellant is not seeking a COA as to the Hearsay Claim or the *Doyle* Claim.

courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners. See, 28

*U.S.C.* § 2253. The standard for the issuance of a COA, either by a District Court judge or a judge

of a Circuit Court of Appeals, was explained by the Supreme Court in *Miller-El v. Cockrell*, 537

U.S. 322, 335-336 (2003):

> As the Court of Appeals observed in this case, §2253© permits the issuance of a
> COA only where a petitioner has made a "substantial showing of the denial of a
> constitutional right." In *Slack*,[4] *supra*, at 483, we recognized that Congress codified
> our standard, announced in *Barefoot v. Estelle*, 463 U.S. 880 (1983), for determining
> what constitutes the requisite showing. Under the controlling standard, a petitioner
> must "show that reasonable jurists could debate whether (or, for that matter, agree
> that) the petition should have been resolved in a different manner or that the issues
> presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529
> U.S. at 484 (quoting *Barefoot*, *supra*, at 893, n. 4).

The court in *Miller-El* also emphasized that the COA determination was a "threshold inquiry

[that] does not require full consideration of the factual or legal bases adduced in support of the

claims." *Id.*, at 336.[5] "Deciding the substance of an appeal in what should only be a threshold inquiry

undermines the concept of a COA. **The question is the debatability of the underlying**

**constitutional claim, not the resolution of that debate.**" *Id.*, at 342. (emphasis added).

The court also emphasized that "a COA does not require a showing that the appeal will

succeed." *Id.*, at 337. "A court of appeals should not decline the application for a COA merely

because it believes the applicant will not demonstrate an entitlement to relief." *Id*:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists
> would grant the petition for habeas corpus. Indeed, a claim can be debatable even
> though every jurist of reason might agree, after the COA has been granted and the
> case has received full consideration, that petitioner will not prevail. As we stated in
> *Slack*, "where a district court has rejected the constitutional claims on the merits, the
> showing required to satisfy §2253© is straightforward: The petitioner must
> demonstrate that reasonable jurists would find the district court's assessment of the
> constitutional claims debatable or wrong." *529 U.S., at 484*.

*Id.*, at 338.

---

[4] *Slack v. McDaniel*, 529 U.S. 473 (2000).

[5] See, *Miller-El*, 537 U.S. at 342 ("COA determination is a separate proceeding, one distinct from
the underlying merits").

## Application of *Miller-El* Standard to the *Beck* Claim

## Overview of Argument

In order to determine whether a COA should issue, it seems necessary that the court engage in something more that a cursory review of the merits of the *Beck* claim. Because Capano's entitlement, under *Beck*, to have the jury instructed on lesser included offenses to First Degree Murder is largely fact-driven, the court should first examine the *Beck* standard itself and then review the evidence in the case which arguably supported instructing the jury on lesser included offenses. Finally, the court should review how the Delaware Supreme Court and the District Court below resolved the *Beck* claim on the merits in order to determine whether Capano has made a "substantial showing of the denial of a constitutional right," and whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El.*, 537 U.S. at 336 and 338.

## Entitlement to Lesser Included Offense Instruction under *Beck*

More than twenty five years ago, in *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that where a defendant is tried for capital murder, the Due Process Clause of the Fourteenth Amendment requires that the jury be permitted to consider a verdict of guilty of lesser included non-capital offenses, when the evidence would have supported such a verdict. As the Court explained:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake.

*Id.* at 637. Two years later, in *Hopper v. Evans*, 456 U.S. 605, 611 (1982), the Court reaffirmed, at least in a capital case, that "due process requires that a lesser offense instruction be given when the evidence warrants such an instruction."

*Beck* and its progeny also hold that the jury be instructed on lesser included offenses in situations where there are "gaps" in the State's case, especially when the gap involves the critical element of the defendant's state of mind. The existence of such "gaps" will independently entitle a defendant to instructions on lesser included offenses. This aspect of *Beck* was explained by the Court in *Schad v. Arizona*, 501 U.S. 624, 646-647 (1991):

> Our fundamental concern in in *Beck* was that a jury convinced that the defendant had committed **some** violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.

> \* \* \* \*

> [In *Beck*], we repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented (citations omitted). As we later explained in *Spaziano v. Florida*, 468 U.S. 447. 455, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984), "the absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .**The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.**"

### Review of the Evidence at Trial

Anne Marie Fahey ("Fahey") was the scheduling secretary for Delaware Governor Thomas Carper. She was last seen alive on Thursday, June 27, 1996, when she went to dinner with Thomas Capano in Philadelphia. Her family reported her missing on June 30, 1996. See, *State v. Capano,* 1998 Del. Super. LEXIS 319, at *5. The defendant, Thomas J. Capano ("Capano") was a prominent Delaware attorney and former managing partner at the Wilmington office of the law firm of Saul, Ewing, Remick and Saul ("Saul Ewing").[6] Capano was married to Kathleen Capano, although they were separated at the time of his arrest. *Habeas Decision*, *2. Capano also had three brothers (Louis

---

[6] Capano's legal career also had included working as a Deputy Attorney General, as City Solicitor for the City of Wilmington, and as legal counsel to former Governor Michael Castle. *Habeas Decision*, *2.

Capano, Jr., Gerard "Gerry" Capano and Joseph Capano) and one sister, Marian (Capano) Ramunno.[7] After a lengthy investigation that targeted Capano from the outset.[8] the State charged Capano with First Degree Murder.[9]

### The State's Theory of the Case

The State charged Capano with First Degree Murder even though Fahey's body was never found and even though the State conceded that it was unable to establish how Fahey had died or that her death had come about as a result of Capano's intentional actions. See, *Capano II*, 781 A.2d at 631 ("apart from the accident defense offered in Capano's testimony. there is no evidence concerning the manner of Fahey's death...Putting aside Capano's accident defense, no one gave eyewitness testimony bearing on the circumstances under which Fahey died"). With no direct or physical evidence to support its allegation that Capano had intentionally caused Fahey's death, the State constructed a wholly circumstantial theory of the case, which rested on three broad categories of evidence: (a) evidence of an alleged "motive;" (b) evidence of an alleged "plan;" and (c) evidence of "consciousness of guilt." See. *Habeas Decision*, *4-*5.

### (a) Evidence of Motive

Fahey began dating Capano in March 1994. Capano came from an affluent family and was sixteen years older than Fahey, who had a traumatic childhood and lived from paycheck to paycheck. Fahey also suffered from an eating disorder and was in treatment with three psychotherapists. She kept her relationship with Capano, or at least its intimate nature. hidden from all but her closest

---

[7] Two of Capano's brothers, Louis and Gerry, also became ensnared in the investigation of Fahey's disappearance. Ultimately, they both entered into plea agreements with the federal government and provided the government with critical information that led to Thomas Capano's arrest. *Habeas Decision*, *3-*4.

[8] In July 1996, the Federal Bureau of Investigation ("FBI") and a federal Grand Jury in Delaware began a kidnaping investigation into Fahey's disappearance. On August 5, 1996, Capano was formally notified that he was a "target" of that investigation. See, *State v. Capano*, 1998 Del. Super. LEXIS 377 *1-*2.

[9] First Degree Murder is defined as "intentionally causing the death of another person". 11 *Del.C.* §636(a).

friends. She also kept the relationship hidden from her boyfriend, Michael Scanlan. She was in love with Scanlan and was concerned that he would discover her relationship with Capano. *Habeas Decision,* *5.

In early 1996, Fahey attempted to break off her relationship with Capano, who continued to profess his love for her. In her personal diary, which was discovered in her apartment after her disappearance by her sister, Kathleen Fahey-Hosey, Fahey wrote on April 7, 1996 that "I have finally brought closure to Tom Capano...what a controlling, manipulative, insecure [and] jealous" maniac." By mid-to-late April, Fahey had ended their romantic relationship. She continued, however, to see Capano, who she still considered to be a friend. *Habeas Decision,* *6. The State's "motive" evidence consisted entirely of statements Fahey allegedly made to her close friends and psychotherapists about Capano's controlling, obsessive nature and overbearing behavior. *Habeas Decision,* *5-*6. This largely hearsay testimony was designed to establish that Capano had a "bad" character — that he was, as Fahey had written in her diary, an "insecure and jealous maniac," whose reaction to her attempts to end their relationship, and to seeing her involved in a serious relationship with Scanlan, somehow culminated in a premeditated murder.

### (b) Evidence of Planning and Premeditation

Because the State had no evidence that would circumstantially establish Capano's state of mind on the night of June 27th , it set out to prove that Capano had planned Fahey's murder well before that night. Here, the State's key witness was Capano's brother, Gerry Capano. During the course of its investigation, the FBI searched Gerry's house and car and seized marijuana, cocaine and an arsenal of weapons. The threat of federal prosecution on drug and weapons charges induced Gerry to enter into a guilty plea to federal criminal charges and to agree to cooperate with the federal government. *Habeas Decision.* *3-*4.

At trial, Gerry testified that, in February 1996, his brother Tom asked if he could borrow $8,000 because he was being extorted by "a guy and a girl," who were threatening to ruin his career and hurt his children. Gerry lent his brother the money, which Tom paid back within several days.

According to Gerry, Tom also asked him if he could use his boat if he ever had to "do something" to these people. Sometime after that, according to Gerry, Tom asked to borrow a handgun for protection. At trial, Gerry admitted that Tom had returned the gun, well before Fahey's disappearance, without it having been fired, and had also returned the money. *Habeas Decision*, *6.

Gerry also testified that, on the morning of June 28, 1996, Tom asked him to help dispose of a body that was in a large cooler at his residence. They drove to Avalon, New Jersey, where Gerry kept his boat, loaded the cooler onto the boat, and sailed east into the Atlantic Ocean some 60-70 miles, where Tom pushed the cooler over the side of the boat. The cooler, however, did not sink, so Gerry shot at it with a gun that he kept on the boat. Gerry also claimed to have seen part of a human foot sinking into the ocean while the cooler, with the lid open, drifted away from the boat. *Habeas Decision*, *8-*10.[10]

The State also established that on April 20, 1996, shortly after Fahey claimed to have ended her romantic relationship with Capano, that Capano had purchased a large marine cooler, even though he did not own a boat and had no knowledge or interest in fishing. The other evidence of a "plan" was provided by Debby MacIntyre. Capano had known MacIntyre for twenty years and they had been involved in a romantic relationship for 17 years, including the time period when Capano was involved with Fahey. At trial, MacIntyre testified that on May 13, 1996, at Capano's request, she had accompanied Capano to Miller's Gun Shop, purchased a handgun and ammunition, and gave these items to Capano, who had been waiting outside the store. *Habeas Decision*, *6-*7.

### (c) Evidence of Consciousness of Guilt

This final category of evidence related the steps taken by Capano after the killing to dispose of physical evidence that might link him to Fahey's disappearance. This evidence included Gerry's testimony about the disposal of Fahey's body, and of removing a loveseat from Capano's house and

---

[10] Gerry's account of the disposal of the cooler and its contents was corroborated in many respects by other evidence in the case. *See, Habeas Decision*, *10-*11. Capano himself also admitted the accuracy of much of Jerry's testimony concerning the disposal of the cooler and its contents. *Id.*, at *15-*16.

placing it in a dumpster. *Habeas Decision*, *8-*10.  Louis Capano, another brother who testified pursuant to a cooperation agreement, testified that, on June 30, 1996. Tom told him that he and Gerry had disposed of a loveseat which had Fahey's blood on it.  According to Louis, Tom Capano told him that Fahey had slit her wrists at his house, but that he took her home afterwards.  Louis testified that Capano asked him to have the dumpster emptied, which he did. *Habeas Decision*, *11-*12. There was also evidence that Capano had purchased a new carpet for his rented house on June 29, 1996.  Capano's housekeeper testified that when she cleaned his house on July 22, 1996, she noticed a new rug and different furniture. *Habeas Decision*, *11.  Finally, there was testimony from a number of sources, including Louis Capano, that Capano never told anyone about Fahey's death and denied knowledge of her whereabouts until the trial. *Habeas Decision*, *17.

### The Defense Case

The case presented by the defense can be divided into two distinct, but somewhat overlapping parts.  The first part consisted of evidence which rebutted, contradicted and undermined the credibility of the State's entirely circumstantial theory of motive and planning.[11]  The second part, which consisted primarily of Capano's own testimony, described a series of events which led to the "accidental" killing of Fahey and of Capano's subsequent attempts to "cover-up" her disappearance.[12]

### (a) Capano's "Accident" Evidence

In addition to presenting evidence and testimony which undermined the State's theory of the case, the defense case was that Fahey's death was an "accident." According to Capano, who testified in his own defense at trial, after they left the Panorama Restaurant in Philadelphia, they decided to go to Capano's house to watch TV.  After they arrived, they sat on a love seat in the great room, and

---

[11] This "rebuttal evidence" is discussed in detail in relation to the claim that Capano was entitled to instructions on lesser included offenses under *Schad*, based on "gaps" in the State's case.

[12] The testimony and evidence concerning Capano's actions after Fahey was killed was not disputed by the defense at trial. See, *Capano II*, 781 A.2d at 585-586 ("Capano's testimony confirmed in many of its essentials the "consciousness of guilt" evidence put forward by the State").



watched "ER," which began at 10:00 p.m. During the show, Capano heard the phone ring, but did not answer it. He thought it might be MacIntyre, who frequently came to his house around 11:00 p.m., and would sometimes spend the night. Capano found an opportunity to phone MacIntyre and told her he had company. *Habeas Decision*, *13.

Sometime after the phone call, Capano and Fahey were still seated on the love seat when Capano heard a noise, looked up, and saw MacIntyre standing in the kitchen. MacIntyre appeared to be distraught and yelled, "Who's this?" According to Capano, MacIntyre had completely "snapped." She was holding a gun at her side and was saying that she was going to kill herself. As MacIntyre began to raise her left arm, which was holding the gun, Capano grabbed her arm and the gun went off, striking Fahey behind her right ear and killing her instantly. The shooting, Capano testified, was "accidental." *Habeas Decision*, *13-*14; (D.I. 28, A155-A158).[13]

### (b) The Delaware Supreme Court's Ruling on the "Accident" Claim Under *Beck*

At trial, based on Capano's "accident" testimony, the defense argued that a rational jury could conclude that Capano had acted "recklessly" or with "criminal negligence" in reaching out for MacIntyre's arm, and that Capano's testimony, standing alone, could support a verdict of either Murder Second Degree, Manslaughter, or Criminally Negligent Homicide. (D.I. 28, A170-A172). The trial court disagreed, reasoning that if Capano was trying to prevent MacIntyre from firing the gun, but it fired anyway, killing Fahey, then it was a pure accident and Capano had no "criminal culpability." (D.I. 28, A168-A169).

---

[13] In her trial testimony, MacIntyre denied that she had gone to Capano's house at all on June 27th, let alone with a gun. *Habeas Decision*, *15. To contradict MacIntyre's testimony, the defense called Kim Johnson, who lived across the street from MacIntyre. Johnson testified that sometime during the last two weeks of June, 1996 (she was unable to pinpoint the exact date), at approximately 11:45 p.m., she heard a car engine racing and a screech of brakes. She then looked out of her bedroom window, which faces directly onto MacIntyre's driveway, and saw MacIntyre "stumble out of the car." She heard MacIntyre "issue a terrible kind of anguished sob," and then saw her run inside her house. (D.I. 28, A165-A167). Capano had testified that MacIntyre left his house at approximately 11:45 p.m. on June 27th and that MacIntyre's house was only a few minutes drive away. (D.I. 28, A159).

In the direct appeal, the Delaware Supreme Court agreed with the trial court's analysis. The court conducted a *de novo* review of the evidence to determine if Capano was entitled to have the jury instructed on lesser included offenses. *Capano II*, 781 A.2d 628. Utilizing the Delaware Criminal Code's "rational basis in the evidence" standard,[14] the court rejected Capano's argument that the "accident" evidence supported his claim that the trial court should have instructed the jury on lesser included offenses:

> This [accident] evidence does not support an instruction on a lesser included offense. This Court has held that an accident defense is incompatible with recklessness or criminal negligence (footnote omitted). Therefore, Capano's account of how Fahey died does not support recklessness or criminal negligence. Capano testified that he prevented MacIntyre from killing herself. Most important, according to Capano's testimony, MacIntyre fired the gun. Capano's testimony was that his role was simply to grab her hand as she lifted the gun up. These facts do not establish any criminal culpability. We are not persuaded by Capano's argument that a jury could find that he acted recklessly or negligently by "grabbing the arm of a hysterical woman threatening suicide and brandishing a gun."
>
> * * * *
>
> His testimony was confined to an accident scenario that involved no crime on his part. To permit Capano now to prevail on an argument that the jury could completely have disregarded both the State's evidence and Capano's testimony and to speculate on a scenario that has no evidentiary support whatsoever would fly in the face of clearly established Delaware statutory and case law.

*Capano II*, 781 A.2d at 633.

Capano's argument that he was entitled to lesser offense instructions based on *Beck* met the same fate:

> Capano argues that the refusal to instruct on lesser included offenses violated Capano's due process rights. Relying principally on the 1980 United States Supreme Court decision in *Beck v. Alabama*, and Delaware authority as well, Capano argues that because he is a defendant in a capital case he has a constitutional right to a lesser included offense instruction in this case. **Capano's argument fails because the right to a lesser included offense instruction depends**

---

[14] See, 11 *Del.C.* §206© ("the court is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense").

> **on there being a rational evidentiary basis for that instruction.**
> **Beck is consistent with that rule.**

*Id.* (footnotes omitted).

### Analysis of Delaware Supreme Court's Ruling on the *Beck* Claim

In the District Court below, in order to obtain federal habeas relief, Capano was required to show that the decision of the Delaware Supreme Court on the *Beck* claim was either "contrary to" or involved an "unreasonable application" of *Beck*. See, *Habeas Decision*, *19-*21.[15] Similarly, in order to obtain a COA, Capano has to make a "substantial showing of the denial of a constitutional right." *Miller-El*, 537 U.S. at 335-336.

#### (a) Overview of Delaware Law

Under Delaware law, the crime of Murder First Degree is defined as "intentionally caus[ing] the death of another person." 11 *Del.C.* §636(a)(1). There are also three other crimes that constitute lesser included offenses to First Degree Murder: Second Degree Murder,[16] Manslaughter[17] and Criminally Negligent Homicide.[18] The distinction between the degrees of homicide is the requisite "state of mind" of the defendant. See, *Delaware Criminal Code with Commentary*, 15-16 (1973); *Lilly v. State*, 649 A.2d 1055, 1060-62 (Del. 1994).

Under Delaware law, a court must charge the jury with respect to a lesser included offense if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." 11 *Del.C.* §206. See, e.g., *Slater v. State*, 606 A.2d 1334, 1338 (Del. 1992) ("a defendant is entitled to an instruction on a lesser

---

[15] The District Court agreed that Capano had "satisfied the exhaustion requirement" for purposes of habeas review of the *Beck* claim. *Habeas Decision*, *22.

[16] Murder Second Degree is defined as "recklessly caus[ing] the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life." 11 *Del.C.* §635.

[17] Manslaughter is defined as "recklessly caus[ing] the death of another person." 11 *Del.C.* §632(1).

[18] Criminally Negligent Homicide is defined as causing "with criminal negligence...the death of another person." 11 *Del.C.* §631.



included offense if the evidence would permit a jury rationally to acquit him of the greater offense and to convict him of the lesser"): *Smith v. State*, 1996 Del. LEXIS 330, at *6 (In deciding whether the evidence meets Section 206(c)'s "rational basis" requirement, the trial court is not permitted to weigh the evidence, because "the weight of the evidence is for the jury to decide...The question is whether a jury **could have** convicted on the lesser offense") (emphasis added); *Gutierrez v. State*, 842 A.2d 650, 652-653 (Del. 2003) (defendant's uncorroborated testimony that killing was in "self-defense" was sufficient under "credible evidence" standard for entitlement to self-defense instruction, "even when the defendant's affirmative defense evidence was not very believable"); *Henry v. State*, 805 A.2d 860, 865-866 (Del. 2002) ("A defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense, 'however weak' that evidence may be...The trial judge may not intrude upon the province of the jury ·which may find credibility in testimony that the judge may consider completely overborne by the simply overwhelming evidence of the prosecutor'").

### (b) The Rejection of Capano's "Accident"Testimony as a Basis For Instructions on Lesser Included Offenses Was Contrary to *Beck* and Amounted to an Unreasonable Application of *Beck*

Whether this Court should grant a COA on the *Beck* claim, based on the "accident" testimony, turns on two interrelated questions: (1) Was the Delaware Supreme Court's ruling that Capano's "accident" evidence did not entitle him to have the jury instructed on lesser included offenses to First Degree Murder contrary to established Delaware law and therefore also "contrary to" or an "unreasonable application" of *Beck* and its progeny?[19] (2) Whether "reasonable jurists

---

[19] In the *Habeas Decision*, the District Court noted that the Delaware Supreme Court had concluded that "the language of [§206(c)] is drawn almost verbatim from the United States Supreme Court's *post-Beck* decision in *Hopper v. Evans*, 456 U.S. 605 (1982)." *Id.*, at *26. The District Court below also appears to have agreed with the Delaware Supreme Court that if Capano was not entitled to have the jury instructed on lesser included offenses under Delaware law, then there could be no *Beck* violation. *Id.* On the other hand, if the decision in the direct appeal was contrary to Delaware law or was an unreasonable application of Delaware law, then Capano is entitled to habeas relief under *Beck*. Capano agrees with the District Court that Delaware law determines whether Capano was entitled to lesser included offense instructions based on the "accident" evidence. However, as
(continued...)

-13-

would find the district court's assessment of the constitutional claims debatable or wrong?"[20] These questions are addressed in the following discussion.

### (1) Entitlement to Lesser Offense Instructions Based on Claim of "Accident" Under Delaware Law

To understand why it is at least "debatable" that habeas relief should be granted on the *Beck* claim, the Court needs to examine the legal landscape of Delaware law in cases where a defendant charged with First Degree Murder claimed that the killing was an "accident." These cases all underscore a direct relationship between the degrees of culpability for a "homicide" and a claim that the homicide was an "accident." The leading case where such a relationship was clearly acknowledged is *Hall v. State*, 431 A.2d 1258 (Del. 1981). In *Hall*, the defendant shot his mother between the eyes, according to expert testimony, from a distance of approximately six inches. Although a witness heard the defendant say "I'll kill you" just before the gun went off, the defendant testified that during a discussion with his mother, the gun, which he had obtained from an upstairs closet, had "accidentally" discharged. *Id.* at 1258-1259. The trial court instructed the jury on the charged offense of Murder First Degree and the lesser included offenses of Murder Second Degree, Manslaughter and Criminally Negligent Homicide. *Id.* at 1258. It also instructed that the defendant's contention "that the shooting was accidental" required the jury to "consider whether the evidence raises a reasonable doubt as to the existence of the state of mind required for the offense in question, that is, whether the defendant acted intentionally, recklessly or with criminal negligence." *Id.*, at 1260. On appeal, the defendant argued that the jury instructions were inadequate because the trial court had not specifically defined the concept of "accident" for the jury. *Id.* That argument was rejected by the Delaware Supreme Court:

---

[19](...continued)
explained in greater detail herein. Capano submits that the existence of "gaps" in the State's case, concerning the means and manner of Fahey's death and Capano's "state of mind" at that time, independently entitled Capano to lesser offense instructions under *Schad*, irrespective of the "accident" evidence.

[20] See, *Miller-El*, 537 U.S. at 338.



The language above, we believe, adequately explains...implicitly by its posture in the charge, that **the defense of accident, if believed, could negate either or both the culpable state of mind or the voluntariness of the act**. The failure to define accident, which definition would have been preferable, caused no prejudice in this case. The jury could not fail to understand the accident contention of the defendant, which was emphasized throughout the trial.

*Id.* (emphasis added).[21]

In holding that the "defense" of "accident" could negate a defendant's "culpable state of mind," the Court in *Hall* clearly held that a defendant's claim that a shooting was an "accident" was, in reality, a claim that the defendant had a lesser degree of culpability than that required for conviction of the charged offense.[22] Thus, under *Hall*, it is the state of mind specified in the statutory definition of an offense that determines precisely which "accidents" will constitute a defense. See, Robinson, *Criminal Law Defenses*, §63, pp. 269-271 & n.4 (1984) (citing *Hall* and noting that courts often deal with "accident" in terms of culpability requirements, which render special provisions concerning "accident" unnecessary or redundant). Thus, if the required state of mind for the charged offense is "intentional," as in Murder First Degree, then evidence of a "reckless accident," or a "criminally negligent accident," will support a charge on lesser included offenses. See, Robinson, *supra*, at §62(b), p. 248.

Another case, decided approximately one year after the decision in *Capano II*, also serves to illustrate that a claim of "accident" will entitle a defendant to instructions on lesser included offenses. In *Henry v. State, supra*, the defendant shot and killed his fiancee, Siobhan Canty

---

[21] In a footnote, the Court explained, "although accident is not expressly a 'defense' in the Delaware Criminal Code, because it is not defined in Chapter 4 of Title 11, or by any other statute...evidence of accident may be produced **to negate the existence of any element of the offense charged.**" *Id.* 431 A.2d at 1259 n.1 (emphasis added).

[22] Parenthetically, *Hall's* treatment of "accident," as a "defense" which can negate a defendant's culpable state of mind, parallels the codification of the defenses of "ignorance or mistake of fact" in 11 *Del.C.* §441. In the Commentary to Section 441, it was noted. "[F]rom the wording of §441, it is clear that even such a mistake as would make a man guilty of another crime is a defense if it negatives the culpable mental state required for commission of the crime with which he is charged." *Delaware Criminal Code With Commentary*, 101 (1973).

("Canty") in the small bathroom of the house they shared. Three bullets struck Canty's body in the head, chest, and back. The gunshots to the head and chest entered at downward angles, indicating that the shots were discharged at close range. The following day, Henry placed the body into a suitcase and loaded it into the trunk of his car and then dumped the suitcase in an area off of Route 9, south of New Castle. *Id.*, 805 A.2d at 862. At trial, Henry testified that on the day of the killing, Canty had taken a shower and started yelling at him. According to Henry, when he entered the bathroom, Canty was standing with a handgun pointed at him. Henry attempted to wrestle the gun away from her. Henry testified that "[they] got in a screaming match. [He] accidentally shot [himself] in the foot, and [he] got extremely upset and just a wave of emotion took over and [he] shot her." Henry testified that he did not intentionally kill Canty. He stated that in pulling the trigger "a total rage of emotions just came over [him], [he] had no control." *Id.*, at 863.

Henry requested the trial judge to instruct the jury on Murder in the Second Degree, as a lesser included offense of Murder in the First Degree. Henry argued that his testimony provided an evidentiary basis for the jury to find that his shooting of Canty was reckless. In refusing to instruct the jury on Murder Second Degree, the trial judge stated "three different parts of the body within a very short period of time. It seems to me that reckless is absurd under those conditions. I'm not going to give it." *Id.* Henry's conviction for First Degree Murder was reversed on appeal.

Even though *Henry* was not a capital murder case, the Delaware Supreme Court concluded that *Beck* provided a well established foundation to instruct the jury on lesser included offenses:

> The United States Supreme Court has recognized that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." This fundamental principle was developed in recognition that the extension of the full benefit of the concept of reasonable doubt may be compromised if the jury had no alternative but to set free a defendant accused of a particularly heinous crime.

*Id.*, at 864 (internal citations omitted).[23]

---

[23] In the *Habeas Decision*, the court below expressed some uncertainty as to whether *Beck* was

(continued...)

Turning to Henry's version of the killing, which was entirely uncorroborated, the court stated:

> Henry asserts that the jury could have held him responsible for the reckless killing of Canty in view of the unknown sequence of the shooting. **He contends the jury could infer from his testimony that he fired the gun wildly in the bathroom.**

> \* \* \* \*

> Despite the trial judge's belief that Henry's contention of recklessness was "absurd," it is well settled that the jury is the sole judge of the credibility of witnesses and is responsible for resolving conflicts in the testimony. In ruling upon a request to instruct the jury on a lesser included offense. the trial judge "must give full credence to [the] defendant's testimony."

> \* \* \* \*

> Henry's testimony presented evidence from which the jury could find the elements of the lesser included offense of Murder in the Second Degree...We hold that the trial judge erred in taking the issue of Henry's *mens rea* away from the jury by refusing to instruct on the lesser included offense of Murder in the Second Degree. That error resulted in a violation of Henry's due process rights under the United States Constitution...

*Id.*, at 865-866.

In *capano II,* however, contrary to the decisions in *Hall* and *Henry*, the Delaware Supreme Court took the option of convicting Capano of a lesser offense away from the jury:

> Capano's account of how Fahey died does not support recklessness or criminal negligence. Capano testified that he prevented MacIntyre from killing herself. Most important, according to Capano's testimony, MacIntyre fired the gun. Capano's testimony was that his role was simply to grab her hand as she lifted the gun up. These facts do not establish any criminal culpability. **We are not persuaded by Capano's argument that a jury could find that he acted recklessly or negligently by "grabbing the arm of a hysterical woman threatening suicide and brandishing a gun."**

_____

[23](...continued)
applicable in non-capital cases. *Id.*, at \*32 n.5. The fact that Capano's death sentence was subsequently reduced to a life sentence is beside the point. This was a capital case when the issue of giving the jury instructions on lesser included offenses was decided in the trial court. It was also a capital case when the direct appeal was decided. Furthermore, the Third Circuit has held that *Beck* is applicable in non-capital cases. See, *Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988). The Delaware Supreme Court did likewise in *Henry*.

*Capano II*, at 633 (emphasis added).

The above quoted explanation – that the court was "not persuaded" that the shooting as described by Capano, could have been either a "reckless accident" or a "criminally negligent accident" – places *Capano II* in a completely different universe from *Hall* and *Henry*. In *Hall*, the court squarely held that a claim that a shooting was an "accident" could serve to negate the state of mind required to convict for intentional murder and allow the jury to convict of a lesser degree of homicide if the jury concluded that the defendant's act was either "reckless" or criminally negligent. *Id.*, 431 A.2d at 1259-1260 & n.1. In *Henry*, the defendant contended that "the jury could infer from his testimony that he fired the gun wildly [i.e."recklessly"] in the bathroom." *Id.*, at 865. That contention was flatly rejected by the trial judge, who characterized the argument as "absurd." *Id.*, at 863. Even though *Henry* was not a capital case, the Delaware Supreme Court cited to *Beck* and admonished the trial court for taking away from the jury the option of finding that the shooting could have been a "reckless" act. *Id.*, 805 A.2d at 866.[24]

In *Capano II*, the court completely ignored *Hall*[25] and took it upon itself to do precisely what it said the trial court should not have done in *Henry* – take the issue of the defendant's state of mind

---

[24] It should also be noted that *Hall* and *Henry* are not aberrations. Instructions on lesser included offenses have routinely been given in cases where the defendant claimed that a shooting was an "accident." See, *Burrell v. State*. 766 A.2d 19, 22, 25 (Del. 2000) (jury instructed on lesser included offenses where defendant claimed that killing of the victim, who was shot in the back of the head at point blank range, was an "accident"); *Gattis v. State*, 1995 Del. Super. LEXIS 608, *99 (jury instructed on lesser offenses to First Degree Murder where defendant claimed that the gun accidentally discharged as he kicked open the apartment door of the victim). As far as can be determined, *Capano* is the only exception.

[25] In *Capano II*, in an attempt to distinguish *Hall*, the court cited to *Hall* and stated that "an accident defense is incompatible with recklessness or criminal negligence." *Id.*, 781 A.2d at 633 n.255. The District Court below rejected that interpretation of *Hall* and agreed with Capano that *Hall* "stands for the proposition that there is such a thing as a 'reckless accident.'" *Habeas Decision*, *29. Furthermore, it should be noted that even if an "accident" defense is "incompatible" with recklessness or criminal negligence, under Delaware law, a defendant is entitled to instructions on lesser included offenses even when the defendant also proffers a wholly exculpatory defense. That very principle was acknowledged by the court itself in *Capano II*. *Id.*, 781 A.2d at 629 (" a jury can convict of a lesser included even when the defendant's testimony, if believed by the jury, would result in acquittal").

away from the jury simply because the **court** was "not persuaded" by the evidence. Perhaps even more troubling than its refusal to adhere to *Hall*, in deciding that the issue of Capano's "state of mind" should not have been submitted to the jury, the court also ignored "this State's strong policy favoring the submission of factual issues to the jury"[26] in criminal cases. See, *Plass v. State*, 457 A.2d 362, 368 (Del. 1983) (issue of defendant's state of mind in a homicide case is "peculiarly for the jury" where evidence supports more than one conclusion).

Finally, there is yet another aspect of the court's ruling that shows just how far removed *Capano II* lies from the mainstream of Delaware law. While in Capano's own mind, the shooting may have been a "pure accident" which involved no culpability on his part because he did not fire the gun and did not intend to shoot Fahey, the Delaware Supreme Court court refused to recognize that the jury could have viewed Capano's conduct – grabbing the arm of a hysterical woman brandishing a gun and threatening suicide – as being the "cause" of Fahey's death. The jury was free to disbelieve some or most of Capano's testimony without rejecting all of it. In other words, the jury could reasonably have concluded that Capano was trying to put the best light on an accident that was in fact reckless conduct by making it seem entirely non-culpable. See, *Henry*, 805 A.2d at 866 ("A defendant is entitled to a lesser included offense instruction even if it 'depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and [State's] witnesses on the other points in dispute'"). Remember, under Delaware's homicide statutes, the defendant is criminally liable if his act "causes" the death of the victim. See, 11 *Del.C.* §261 ("Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred"); *Gray v. State*, 441 A.2d 209, 223 (Del. 1989) (where a voluntary act is found, the actor is responsible for the natural and foreseeable consequences of that act, even when other causes may have contributed to the ultimate result). Under Delaware law, issues of causation are left for the jury to determine. See, *Culver v. Bennett*, 588 A.2d 1094. 1098 (Del. 1991). In this case,

---

[26] *Hall v. State*, 431 A.2d at 1259.



contrary to established Delaware law, the issue of causation was also taken from the jury by the Delaware Supreme Court..

### (2) Entitlement to Lesser Offense Instructions Under *Schad* Based on "Gaps" in the State's Case

In the direct appeal, the Delaware Supreme Court also rejected Capano's argument, based on *Schad*, that "gaps" in the State's evidence concerning his state of mind when Fahey was killed independently provided a ground to instruct the jury on lesser included offenses. *Capano II*, 781 A.2d at 631:

> The possibility that Capano killed Fahey by an act that was reckless, criminally negligent, or under the influence of extreme emotional disturbance is based entirely on speculation. Although there is evidence of the disposal of Fahey's body, the parties concede that apart from the accident defense offered in Capano's testimony, there is no evidence concerning the manner of Fahey's death. Her body was not recovered and neither was any murder weapon. Putting aside Capano's accident defense, no one gave eyewitness testimony bearing on the circumstances under which Fahey died. **If the State's planning evidence and Capano's accident defense are rejected, it is possible that Capano killed Fahey in some kind of jealous rage, or some other reckless or negligent act. But these possibilities are only speculative. They are not supported by any rational basis in the evidence.**

*Id.*, at 631.

As previously explained herein, a state court decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal rule from [the Supreme] Court's cases, but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor, supra,* 529 U.S. at 407 (O'Connor, J., concurring) (controlling opinion). As the discussion which follows will explain, *Schad* clearly stands for the proposition that "gaps" in the State's case, especially where the gap involves the critical element of the defendant's state of mind, will independently entitle a defendant to instructions on lesser included offenses.

In order to convict Capano for First Degree Murder, the State was required to prove not only that a killing occurred, but also had to prove that the killing was "intentional." See, *State v. Moyer*, 387 A.2d 194, 195 (Del. 1987). Furthermore, it is the defendant's state of mind that is the critical

element which distinguishes murder first degree from its lesser included offenses. *Duonnolo v. State*, 397 A.2d 126, 130 (Del. 1978). Even if Capano had not testified concerning the "accident," he would nevertheless have been entitled to have the jury instructed on lesser included offenses under *Beck* and *Schad* because there were "gaps" in the State's case concerning proof of Capano's state of mind. This aspect of *Beck* was explained by the Court in *Schad v. Arizona*, 501 U.S. 624, 646-647 (1991):

> Our fundamental concern in in *Beck* was that a jury convinced that the defendant had committed **some** violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.
>
> * * * *
>
> [In *Beck*], we repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented (citations omitted). As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984), "the absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."

The concern in *Beck* and *Schad* that the fact-finding process is distorted when the jury is forced into an all-or-nothing choice was recognized by the Delaware Supreme Court in *Chao v. State*, 604 A.2d 1351, 1359 (Del. 1992):

> By according defendants the procedural safeguard of providing jurors with the additional option of convicting a person of a lesser included offense, the defendant is more likely to receive the full benefit of the reasonable doubt standard. *Beck*, 447 U.S. at 634. In other words, by limiting a jury's choice of convicting or acquitting a defendant of the charged offense alone, jurors who have determined that a serious crime was committed may convict a person simply because they believe he or she deserves to be punished, although not necessarily for the crime with which the defendant was charged. **The third option of convicting on a lesser included offense reduces the risk of unwarranted convictions [for capital murder].**

This "fundamental concern" in *Beck* was also echoed by the Delaware Supreme Court in *Henry*:

> "At common law the jury was permitted to find the defendant guilty of any lesser offense necessarily included in the offense charged." (footnote omitted). That rule originally developed as "an aid to the prosecution in cases in which [its evidence] failed to establish some element of the crime charged." (footnote omitted). Such instructions provide the jury with a less dramatic alternative than the sharp choice between conviction of the offense charged and acquittal.

*Id.*, 805 A.2d at 863-864.

In *Chao*, as noted above, the court interpreted *Schad* as creating a "**procedural safeguard**" designed to give a capital defendant the "full benefit of the reasonable doubt standard." *Id.*, at 1359. The court also interpreted *Schad* as "mandating" that juries be given a "third option" in a capital case in order to avoid presenting the jury with "an all-or-nothing choice between a capital murder conviction and innocence. *Id.*, at 1360.[27] The court reasoned that *Schad* approved of allowing the jury "the third option of convicting on a lesser included offense [in order to reduce] the risk of unwarranted convictions [for capital murder]." *Id.*, at 1359.

It would be difficult indeed to mount an credible argument that *Chao* was not a "reasonable" interpretation of *Beck* and *Schad*. Indeed, the defendant in *Henry* received the benefit of *Chao's* "procedural safeguard" even though *Henry* was not a capital case. Why was the "procedural safeguard" that was "mandated" in *Chao* not extended to Capano? The answer is that the Delaware Supreme Court simply ignored *Beck*, *Schad* and *Chao*.[28] As discussed in detail below, the conflicting and largely inconclusive evidence of "motive" and "planning," and especially the lack of any evidence concerning Capano's state of mind and the manner or means of Fahey's death, made this

---

[27] In *Chao* itself, the court held that the convictions should not be reversed based on *Beck/Schad* because the jury in that case was not faced with the "all or nothing" choice of convicting Chao of a capital offense or voting for an acquittal. *Id.*

[28] In the direct appeal, the State argued that Capano's exculpatory testimony that Fahey's death was an "accident" barred Capano from having the jury consider lesser included offenses. That argument, however, was squarely rejected by the Delaware Supreme Court as a matter of state law. *Capano II*, 781 A.2d at 629-630.

case a paradigmatic *Beck/Schad Chao* scenario – a scenario that required instructions on lesser included offenses.

This was an extraordinary case to be tried as a capital murder. There was evidence of a killing, the first element of a first degree murder, but no evidence that established the killer's state of mind. At trial, the State conceded that it did not know, and did not prove, "exactly how Ann Marie [Fahey] physically died." (D.I. 28, A-173). In many cases, a jury can infer the defendant's intent from physical evidence present at the crime scene – from the number or placement of the wounds, or from the type of weapon used, or from the condition of the victim's body.[29] In this case, however, there were no "circumstances surrounding the act" from which the jury could infer the defendant's state of mind. There was no evidence that Capano had ever expressed an intention to murder Fahey. The State had no eyewitnesses to the killing. It had no body. There was no weapon recovered. There was also no forensic evidence that could circumstantially establish the state of mind of the killer. The State could not prove whether Fahey had been shot, stabbed, bludgeoned, or strangled. It could not prove whether Fahey died as a result of one wound or several. Because the State had no evidence "from the circumstances surrounding the act" from which a jury could infer Capano's state of mind, the State sought to prove that Capano intentionally killed Fahey by proving a motive, plan and "consciousness of guilt."

The evidence that provided the alleged motive for the killing was, at best, inconclusive. That a person is viewed by a former lover as "controlling" does not mean that he has plotted a murder. This was also not a case where a long history of domestic violence could be viewed as a prelude to murder. Fahey did not tell her therapists or friends that she had been physically abused by Capano. In fact, there was **no** direct evidence that Capano had ever hurt or threatened Fahey at or around the time of the incident. However tense the relationship between Fahey and Capano may have been in

---

[29] Since the State will rarely have direct evidence of the defendant's state of mind, Delaware law recognizes that a defendant's state of mind may be "inferred by the jury from the circumstances surrounding the act [the defendant] is alleged to have done." 11 *Del.C.* §307(a).



the months after she began seeing Scanlan, by the Spring of 1996 - in the weeks actually preceding her death - virtually everyone agreed that the relationship had settled down. (D.I. 28, A58; A81). There was no evidence to suggest that, in late June, Capano was still angry over Fahey's change of heart. Indeed, there was overwhelming evidence to the contrary. There was extensive evidence demonstrating that in the months preceding the killing, Fahey and Capano had developed a warm and affectionate friendship. They often dined together, conversed frequently, and shared confidences. Fahey continued to rely on Capano, even calling him from work on June 12, 1996, when she became sick and needed a ride home. (D.I. 28, A84; A88-A89). And there was compelling evidence, much closer to the date of the killing itself, demonstrating that, rather than planning to kill Fahey, Capano was desperately trying to keep her alive, paying her therapist's bills, urging her to seek help for her eating disorder, even meeting with her friends in an effort to get her treatment. (D.I. 28, A151).

The "plan" evidence also was weak and remote in time. The alleged conversation with Gerry Capano about borrowing a gun and using Gerry's boat preceded the killing by four months. There was also good reason for the jury to disbelieve Gerry's testimony on that issue – testimony which he acknowledged he had a motive to fabricate after he was threatened with federal prosecution for drug possession and with the loss of his children. (D.I. 28, A106-A107). The jury heard about Gerry's hostile phone call to his mother after the bail hearing where he admitted that he would "make [things] up as I go along to "keep Tommy [in jail] for life." (D.I. 28, A109). Moreover, the defense put on expert testimony by Dr. Carol Tavani, a psychiatrist with a specialty in neuropsychiatric difficulties, (D.I. 28, A141), who explained that Gerry's heavy cocaine use could have resulted in a condition known as "confabulation" – a memory disorder that results in a person filling in memory gaps with what the person believes is the truth, but, in fact, is not. (D.I. 28, A142). Gerry's testimony was also contradicted by Capano, who testified that he never told Gerry why he needed the $8,000; that it was Gerry who speculated that he was in some kind of trouble; and, that it was Gerry's idea to give him the gun because he had no alarm system at his home. (D.I. 28, A145-A149 ).

The State's argument that the cooler was purchased as a prelude to murder was also rebutted by the defense. Capano purchased the cooler in April, with his credit card. Capano testified that he bought the cooler as a present for his brother, intending to give it to him over the July 4th holiday (D.I. 28, A145-A146). That testimony was corroborated by Joseph Capano. (D.I. 28, A139-A140). The jury also was entitled to reject MacIntyre's trial testimony - a story that she proffered only after receiving complete immunity for all crimes she may have committed but contingent upon her non-involvement in Fahey's death. (D.I. 28, A121). At trial, MacIntyre testified that in May 1996, Capano persuaded her to buy a handgun for him. (D.I. 28, A122-A127). Prior to the trial, however, MacIntyre had told investigators a completely different story. She stated that she had purchased a small handgun "a few years ago" for self-defense, but had subsequently taken it apart and thrown it away. She also denied that Capano was with her when she bought the gun or that she had ever given it to him. (D.I. 16, State's Ex. 147). Furthermore, even if the jury believed that MacIntyre had purchased a gun for Capano, there was no evidence, apart from Capano's testimony, that Fahey was killed by a gun. There was also no evidence that MacIntyre's gun was the homicide weapon.

There was also no evidence that Capano had made arrangements with Gerry to use his boat and no evidence that Capano even knew whether Gerry was even available to assist him on the day after Fahey was killed. At trial, Gerry conceded that he had not spoken or met with his brother about whether he would be available to assist in disposing of a body in the days preceding June 28, 1996; that Capano did not know if he would be home that morning; and that they did not have a prearranged meeting for use of his boat. (D.I. 28, A-108).

Lastly, to prove the killing was intentional, the State introduced evidence of "consciousness of guilt," which included Capano's denial of any involvement in Fahey's disappearance and his disposing of all forensic evidence that would shed light on how Fahey had died. See, *Capano II*, 781 A.2d at 603-604. Although this evidence was largely undisputed by the defense, "consciousness of guilt" evidence is generally considered to be problematic on the question of a defendant's state of mind. See, J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶401[10] at 401-72-78 (1996). Here,

the "consciousness of guilt" evidence suggested that Capano had committed **some** wrongful act, but it shed no light on his state of mind at the time of the commission of the act. See, *Colon v. State*, 1994 Del. LEXIS 326, at *5 (Del. 1994) (consciousness of guilt evidence cannot be used to establish state of mind **prior** to criminal misconduct); *Cline v. State*, 720 A.2d 891, 893 n.8 (Del. 1998) (defendant's flight reflected consciousness of guilt, but was not probative of an intent to deliver drugs, as opposed to lesser included offense of possession).

Any homicide is a serious crime. A person who was involved in **any** homicide, regardless of his mental state, would have a powerful motivation to cover up his involvement, create an alibi, and dispose of incriminating evidence. A person who has caused the death of another is also likely to panic, just as Capano testified that he panicked. (D.I. 28, A162-A163). Indeed, Capano's actions after the homicide were just as consistent with an unplanned homicide as with a premeditated murder. A jury could certainly have concluded that Capano's actions after the killing were the actions of a person who had unintentionally, but recklessly, killed someone and was terrified of facing the consequences.

Without the benefit of any evidence concerning the manner or circumstances of Fahey's death, and without the benefit of any evidence concerning Capano's state of mind at the time of the homicide, the conclusion that Fahey's death resulted from an intentional act required the jury to engage in no more or less speculation than the conclusion that her death was the result of a reckless act. If the defendants in *Chao* and *Henry* were entitled to the "procedural safeguard" of allowing the jury to consider lesser offenses, why was the same "safeguard" denied to Capano? The "gaps" in the State's case concerning Capano's state of mind, combined with the evidence which rebutted the State's "motive" and "plan" evidence, thus presented a paradigmatic *Beck/Schad* scenario. In this case, there exists a very real probability that the jury voted to convict Capano of intentional murder, even though they may have harbored a reasonable doubt concerning his state of mind, because the only other alternative was to set him free.

Indisputably, something happened inside Capano's house that resulted in Fahey's death. The jury heard Capano himself confirm the essential details of Gerry Capano's chilling account[30] of the disposal of Fahey's body in the Atlantic Ocean. See, *Capano II*, 781 A.2d at 585-586. In finding Capano guilty of First Degree Murder, the jury clearly rejected Capano's claim that the death was a "pure accident" that involved no criminal liability on his part. The concern expressed in *Schad* – that forcing the jury into an all-or-nothing choice distorts the fact finding process and increases the risk that the defendant will be found guilty – was realized in this case. Based alone on Capano's confirmation of Gerry's account of the disposal of Fahey's body, is it possible, or even conceivable, that any rational juror would not vote to convict for intentional murder, even if that juror had a reasonable doubt that the killing was "intentional, if the only other alternative available was to acquit and set Capano free?

Finally, the court should consider what happened in Capano's penalty hearing as bearing on the issue whether the decision in *Capano II* was an unreasonable application of *Beck/Schad*. In the penalty hearing, in order for Capano to be eligible to be sentenced to death, the jury had to find, unanimously and beyond a reasonable doubt, the existence of at least one "statutory aggravating circumstance." 11 *Del.C.* §4209(d). In this case, the **only** statutory aggravating circumstance alleged by the State was that the murder was "premeditated and the result of substantial planning." See, 11 *Del.C.* §4209(e)(1)(u). (D.I. 28, A179). The evidence relied upon by the State to prove this statutory aggravating factor was the very same evidence of motive, planning and cover-up that the State had relied on in the "guilt phase' of the trial to prove that the killing was "intentional." (D.I. 28, A178.1-A178.2). All twelve jurors agreed, in the guilt phase, that Capano was guilty of "intentional murder," Yet, in the penalty phase, where the same jury was confronted with the same question, based on the same evidence that had been presented in the trial, only eleven members of the jury believed that the State had established the "substantial planning/premeditation" statutory aggravator. (D.I. 28, A180).

---

[30] See, D.I. 28, A101-A102.



These seemingly inconsistent verdicts provide telling evidence that the "fundamental concern" expressed by the Supreme Court in *Beck* is very real. In the penalty phase, one member of the jury was **not** convinced beyond a reasonable doubt that Capano had "planned" to kill Fahey. Yet, when faced with the choice of either convicting Capano of intentional murder, based on the same evidence of motive, planning and cover-up, or setting Capano free, that same juror opted to convict. That juror's inconsistent verdicts suggest that at least one juror, and maybe more, may have convicted Capano of first degree murder, not because the juror believed that Capano had "intentionally" killed Fahey, but because that juror believed, in the words of *Chao*, that Capano committed "some violent crime" and "deserve[d] to be punished," where the only other option available to the jury was to set Capano free.

### Analysis of District Court's Ruling on the *Beck* Claim

The final prong of the *Miller-El* inquiry asks whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.*, 537 U.S. at 336. That inquiry thus requires some analysis and comment on the decision in the District Court below.

### (1) The "Accident" Evidence under *Beck*

In this case, with respect to the "accident" evidence, the District Court was confronted with the same arguments that have been presented herein. However, unlike the Delaware Supreme Court, the District Court acknowledged that Capano was correct in his contention that *Hall, Burrell, Gattis,* and *Henry* all stood for the proposition that Delaware law allowed for the possibility that a shooting could be a "reckless accident," that would entitle the defendant to have the jury instructed on lesser included offenses. *Habeas Decision*, *29-*30. Having made that significant concession, in order to deny habeas relief, the District Court was thus compelled to somehow distinguish *Hall, Burrell, Gattis* and *Henry*:

-28-

The facts of *Hall*, however, are a world removed from those presented here. In this case, **Capano, if his testimony is to be believed, never had possession of the firearm, much less pointed it at Fahey.** Rather, he attempted to prevent a purportedly suicidal woman from shooting herself. While the facts of *Hall* offered a rational basis for jury instructions on lesser included offenses, the facts here simply do not.[31]

\* \* \* \*

No Delaware precedent called to our attention suggests that Capano, under his rendition of the facts, committed any act which runs afoul of the State's homicide statutes. **The cases referenced by Capano all involve situations where the defendant actively possessed a firearm and pointed it toward the victim.** (citations omitted). That was not the situation here. Accordingly, it was not objectively unreasonable for the Delaware Supreme Court to decide that Capano's alleged attempt to disarm a woman threatening suicide provided no rational basis for a jury instruction on second degree murder, manslaughter, or criminally negligent homicide.[32]

Appellant respectfully submits that the District Court's disposition of the "accident" claim under *Beck* is at least "debatable" if not wrong. First, unlike the District Court, the Delaware Supreme Court in *Capano II* did not even attempt to distinguish *Hall* and its progeny from this case on the ground that those defendants, unlike Capano, all admitted to firing a weapon. Rather, unlike the District Court below, the Delaware Supreme Court simply (and wrongly) refused to read *Hall* as even allowing for the possibility of a "reckless accident." According to the Delaware Supreme Court, *Hall* was inapplicable because "an accident defense is incompatible with recklessness or criminal negligence." *Id.*, 781 A.2d at 633; *id,* n255 (citing *Hall* as holding that defendant's accident defense was the "antithesis of the acts and states of mind which characterize the various degrees of homicide"). In other words, even if Capano had admitted to firing the weapon, the Delaware Supreme Court would still have held that *Hall* was inapplicable.

---

[31] *Habeas Decision*, *29.

[32] *Habeas Decision*, *31.

Second, the District Court's conclusion that Capano's "accident" testimony did not involve any act on his part that "[ran] afoul of the State's homicide statutes"[33] is also at least "debatable," if not wrong. The Delaware homicide statutes impose liability whenever the defendant "caus[es] the death of another person."[34] Furthermore, under 11 *Del.C.* §261, "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." Whether Capano's act of trying to disarm MacIntyre by grabbing her arm (which was holding the gun) and trying to push it down was the "cause" of Fahey's death was for the jury to decide. See, *Culver v. Bennett, supra*, 588 A.2d at 1098 ( issues of causation are left for the jury to determine).

The District Court was correct in stating that the facts in *Capano* were "a world removed" from those in *Hall, Henry, Burrell* and *Gattis*. What separates *Capano* from the other "accident" cases is not he fact, emphasized by the District Court, that Capano did not admit to possessing or firing a weapon. What really separates the decision in *Capano II* from the other cases is that in all of the other cases, the jury was given the "third option" to convict of a lesser included offense, even though, in those cases, unlike *Capano*, there was substantial physical and forensic evidence to allow the jury to conclude that the killings were "intentional."

### (2) Analysis of District Court's Treatment of the *Schad/Chao* Issue

The District Court's approach to Capano's alternative argument that the decision in *Chao* "mandated" that Capano be afforded the "procedural safeguard" of allowing the jury to consider a "third option" was to ignore the issue entirely. Although the decision in *Chao* received extensive treatment in the Briefs filed by Capano in the District Court, it is not even mentioned in the the the *Habeas Decision*. The rationale for *Beck/Schad*, expressed in *Chao*, is that when jurors are given an "all or nothing" choice in a capital case, there is a substantial risk that the jury will not give effect to the reasonable doubt standard and vote for acquittal in a case where they believed that the

---

[33] *Habeas Decision*, *31.

[34]See, 11 *Del.C.* §636(a)(1); 11 *Del.C.* §635; 11 *Del.C.* §632.

defendant "had committed **some** violent crime, but not convinced that he was guilty of a capital crime." *Schad*, 501 U.S. at 646-647. In other words, the court in *Schad* recognized the reality that jurors who are presented with an all-or-nothing choice cannot always be trusted to act rationally and vote to acquit whenever the State's case falls short of establishing that the defendant is guilty of a capital crime such as First Degree Murder. Conversely, in the *Habeas Decision*, the District Court, unlike the court in *Schad/Chao*, simply refused to allow for the possibility of juror irrationality:

> Simply put, the only option other than conviction of first degree murder available to the jury on the record before it was to find that the State had not proven first degree murder beyond a reasonable doubt, either because the State's evidence in and of itself was insufficient or because the jury believed that Fahey had died at the hand of MacIntyre with no culpability on the part of Capano. **Consequently, the jury could only rationally have found Capano guilty of first degree murder or have acquitted him.**

*Habeas Decision*, *27-*28 (emphasis added).

In this case, is it possible to believe that the jury, having heard Capano admit to the details of the disposal of Fahey's body in the Atlantic Ocean, would "rationally" vote to acquit just because they had a reasonable doubt that the killing itself was "intentional"? The District Court's refusal to even consider that possibility requires that this Court issue a COA.

## Conclusion

The Appellant respectfully submits that the standard established in *Miller-El* for the issuance of a COA has been met in this case. In this case, the question whether the decision in *Capano II* was an "unreasonable" application of *Beck* itself turns on whether the Delaware Supreme Court adhered to its own precedents in refusing to allow the jury to consider lesser included offenses. The Delaware Supreme Court's refused to acknowledge that its decision in *Hall* allowed for instructions on lesser offenses based on a claim of "reckless accident." The Delaware Supreme Court also unreasonably refused to follow its own precedents and allow the jury to decide the purely factual issues of Capano's state of mind and whether Capano's act of trying to disarm MacIntyre was the legal "cause" of Fahey's death. The Delaware Supreme Court also unreasonably refused to afford Capano

the "procedural safeguard" of allowing the jury a "third option" to convict of a lesser included offense even though it had recognized ibn *Chao* that giving the jury that option was virtually "mandated" by *Schad*.

The Court should also issue a COA because it is at least "debatable" that the District Court's resolution of the *Beck* claim was correct. The District Court's conclusion that instructions on lesser included offenses was not required under *Hall* failed to account for the fact that issues of the defendant's state of mind and issues of "causation" belonged to the jury under Delaware law. The District Court's refusal to acknowledge the likelihood, recognized in *Scad* and *Chao*, that a jury faced with an all-or-nothing choice would act irrationally and vote to convict of capital murder even if they had a reasonable doubt that Capano had acted "intentionally" with respect to the killing, also warrants the issuance of a COA.

*Joseph M Bernstein*

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 302
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein a embarqmail.com
Attorney for Appellant

Dated: May 27, 2008

# Exhibit 1

1 of 14 DOCUMENTS

## THOMAS J. CAPANO v. THOMAS L. CARROLL, et al.

### CIVIL ACTION NO. 06-58

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### 2008 U.S. Dist. LEXIS 32648

### April 15, 2008, Decided
### April 15, 2008, Filed

**COUNSEL:** [*1] For Thomas J. Capano, Petitioner: Joseph M. Bernstein, LEAD ATTORNEY, Joseph M. Bernstein, Esq., Wilmington, DE.

For Warden Thomas J. Carroll, Attorney General of State of Delaware, Respondents: Elizabeth Roberts McFarlan, Department of Justice, Wilmington, DE.

**JUDGES:** HARVEY BARTLE III, C.J. SITTING BY DESIGNATION.

**OPINION BY:** HARVEY BARTLE III

**OPINION**

*MEMORANDUM*

Bartle, C.J.

Before the court is the petition of Thomas J. Capano for habeas corpus relief under *28 U.S.C. § 2254.* He alleges that he is in state custody in violation of the Constitution of the United States.

Capano, a prominent Delaware lawyer, was convicted in the Superior Court in and for New Castle County of murder in the first degree of Anne Marie Fahey, the scheduling secretary of the State's then-Governor, Thomas R. Carper. Judge William Swain Lee sentenced Capano to death upon recommendation of the jury. *State v. Capano, Cr.A. No. 97-11-0720, 1999 Del. Super. LEXIS 541 (Del. Super. Ct. Mar. 16, 1999).* The Supreme Court of Delaware affirmed on direct appeal, and the United States Supreme Court denied Capano's petition for a writ of certiorari. *Capano v. State, 781 A.2d 556 (Del. 2001), cert. denied, Capano v. Delaware, 536 U.S. 958, 122 S. Ct. 2660, 153 L. Ed. 2d 835 (2002).* In a subsequent [*2] post-conviction proceeding, the state Supreme Court overturned his death sentence and remanded for a new penalty trial. *Capano v. State, 889 A.2d 968 (Del. 2006).* When the State elected not to proceed with that second trial, Capano was resentenced to life in prison without the possibility of parole.

I.

Anne Marie Fahey, age 30, was last seen in public on Thursday evening, June 27, 1996, while dining at a Philadelphia restaurant with Capano, age 46, who was then separated from his wife Kay. Capano was the managing partner of the Wilmington office of a large Philadelphia-based law firm and a frequent participant in the civic and political life of Wilmington and the State of Delaware. Previously he had served as a state prosecutor, City Solicitor for the City of Wilmington, and Legal Counsel to former Governor Michael N.

Castle.

Fahey's absence from her office on Friday, June 28 did not cause concern because she was not scheduled to work that day. It was not until she failed to appear at a family function on Saturday evening, June 29 that her relatives contacted Wilmington police to report her missing. Almost immediately, the police directed their attention toward Capano. Around 3 a.m. on **[*3]** Sunday, June 30, they visited Capano at his home on Grant Avenue in Wilmington. [1] He stated in response to their inquiries that he had not seen or heard from Fahey since dropping her off at her Wilmington apartment after an uneventful evening on the previous Thursday, June 27. The police returned on Sunday afternoon, and Capano permitted them a "walkthrough" of his home. They saw nothing suspicious. However, they continued to focus on Capano as a suspect when they learned he had been involved in a discreet, on-again-off-again affair with Fahey since late 1994. By mid-July, 1996, the Federal Bureau of Investigation ("FBI") had begun to assist the State and local authorities. Despite intensive efforts, the investigation proceeded slowly for over a year without the discovery of Fahey, her body, or any murder weapon.

> 1   After Capano and his wife separated in September, 1995, he moved out of the family's Wilmington home where his wife and four daughters lived and into a house on Grant Avenue.

The turning point came in October, 1997 when federal agents raided the Wilmington home of Capano's brother Gerry and found illegal drugs and guns. The next month, Gerry, facing federal charges, became **[*4]** a cooperating witness. He told authorities that he had helped Capano dispose of a body in the Atlantic Ocean on Friday, June 28, 1996 and provided them with other incriminating evidence. In November, 1997, Louis Capano, another brother, began his cooperation with the prosecution as part of a plea agreement. In

February, 1998, Deborah MacIntyre, a long-time paramour of Capano, similarly signed a plea agreement and disclosed to the State significant helpful information. [2]

> 2   Gerry, Louis, and MacIntyre each admitted to having initially lied to the Grand Jury and to the authorities.

Capano was arrested on November 12, 1997 and was indicted by the State of Delaware on a single charge of first-degree murder. In October, 1998, Capano went to trial before Judge Lee and a jury in the New Castle County Superior Court. The trial lasted three and a half months. The State presented a case grounded largely upon circumstantial evidence without the body of Fahey or the murder weapon ever having been found. The prosecutors presented evidence that Capano, as a rejected lover, had a clear motive to kill Fahey, that he had formulated a plan to do so, and that his actions on June 27, 1996 and thereafter reflected **[*5]** a consciousness of guilt.

The evidence at trial revealed that Fahey had begun dating Capano in March, 1994 and that it soon turned into an intimate relationship. Capano, who came from an affluent family and was sixteen years older than Fahey, constantly showered her with expensive gifts. Fahey had had a traumatic childhood and lived from paycheck to paycheck. For several years she had also been suffering from an eating disorder.

Fahey kept the nature of this relationship secret from all but her closest friends, largely because she felt enormous guilt as Capano was married with four daughters. In late 1995, Fahey started dating Michael Scanlan, a young accountant. She began to fall in love with Scanlan and became more and more concerned that he would discover her relationship with Capano. Fahey worried that Capano would disclose her eating disorder to her new boyfriend.

In early 1996, Fahey tried to break off her relationship with Capano even as he continued

to pronounce his love for her. Several of Fahey's closest friends testified that between February and April, Fahey frequently complained about his controlling, obsessive nature and his overbearing behavior. Also during this period, [*6] Fahey revealed her troubled and strained relationship with Capano to her psychiatrist and to her two psychologists who had been professionally treating her. On April 7, 1996, Fahey wrote in her diary that, "I have finally brought closure to Tom Capano ... what a controlling, manipulative, insecure jealous maniac." By mid-to-late April, Fahey had ended their romantic relationship. From that point on, although she and Capano continued to see each other, she considered him at most to be a friend.

The State introduced circumstantial evidence to prove that by early 1996 Capano had begun to plot Fahey's death. Two of his brothers, Gerry and Joe, testified that in February, 1996, he told them a story about being threatened by one or more unidentified extortionists. Gerry related that in connection with the supposed extortion, he loaned Capano $ 8,000 and a handgun, both of which Capano returned to him by May, 1996. Significantly, Gerry testified that at some time between February and May, 1996, Capano asked if he could borrow Gerry's boat if he needed to dispose of a body.

The State established that on April 20, 1996, shortly after Fahey had made clear to Capano that she no longer wanted a romantic [*7] relationship, he purchased a large marine cooler even though he did not own a boat or have any knowledge of or interest in fishing. Deborah MacIntyre, Capano's mistress of seventeen years, provided further crucial evidence. She testified that on May 13, 1996, he drove her to Miller's Gun Center in Wilmington where at his request she purchased for him a handgun and ammunition while he waited in the car outside. She said she returned to the car, gave him the purchases, and never saw the gun or ammunition again.

After presenting its case as to both motive and premeditation, the State introduced evidence that on Thursday, June 27, 1996 and afterward, Capano behaved in a manner consistent with a consciousness of guilt. On that Thursday, the day of her disappearance, Fahey left work in the Governor's Office at about 4:30 p.m. and met with her psychiatrist, Dr. Neil Kaye. Sometime thereafter, she and Capano traveled to a restaurant in Philadelphia for dinner. Their server at the restaurant, who was called as a witness, stated that they "didn't speak to each other at all" and that Fahey looked "haggard and gaunt" and had a "somber" demeanor.

Capano did not appear at his law office on Friday, [*8] June 28 and had cancelled a golf game he had planned with a friend for that day. According to Gerry, early that Friday morning between 5:30 and 5:45 a.m., Capano, without prearrangement, drove his Jeep Cherokee into the driveway of Gerry's house in Wilmington. Capano requested to borrow Gerry's boat. Gerry immediately assumed Capano needed to do so because he had killed his supposed extortionist. Gerry asked him, "Did you do it?" Capano nodded affirmatively. Gerry then agreed that Capano could use the boat but only if Gerry accompanied him since Capano had no nautical expertise. Capano reluctantly agreed. Because Gerry first had some business matters to take care of, the two planned to meet at Capano's home in Wilmington later that morning.

By the time Gerry arrived at Capano's home at about 8:30 a.m., Capano had exchanged his Jeep Cherokee for his estranged wife's Suburban, which was larger than the Jeep Cherokee. Gerry entered Capano's garage where he saw a large marine cooler covered by a chain and lock. Although Gerry did not look inside the cooler, he instructed Capano to remove the chain and lock to lessen the likelihood of suspicion in the event that they were stopped by the [*9] police. The two then placed the cooler into the back of the Suburban.

Capano, accompanied by Gerry, drove the Suburban at a high rate of speed to Gerry's beach house in Stone Harbor, New Jersey. There, the two transferred the cooler to Gerry's boat, locked it again using the lock and chain, and took the boat with its cargo to a nearby marina where Capano paid a large sum in cash to fill the boat's gas tank. Gerry then piloted the boat some 60 miles off shore to a location where the ocean was almost 200 feet deep. At that point, Capano pushed the cooler with its contents overboard, and when the cooler would not sink, Gerry shot a hole in it with a shotgun he kept on his boat to kill sharks. After the cooler continued to float, Capano pulled it back onboard. Gerry placed the boat's two anchors next to Capano and then moved away toward the other end of the boat. However, he turned around in time to observe an ankle and foot descending into the water. He also noticed that the anchors, the lock, and the chains were gone. After the brothers rinsed out the empty cooler, Gerry unscrewed its lid and tossed both parts back into the ocean. Their mission completed, the two returned to Stone Harbor [*10] before driving back that afternoon to Capano's house in Wilmington.

Once back in Wilmington, Gerry helped Capano carry a bloodstained love seat from the "great room" of Capano's house to the garage. Unable to dismantle the love seat or to cut out the stained portions, they took it in the Suburban to a nearby site where a family business owned in part by their brother Louis was engaged in construction. They dropped the love seat into a large dumpster where Gerry covered it with construction debris. Gerry then headed home.

The State corroborated in crucial respects Gerry's account of the events of Friday, June 28. On July 4, a Delaware fisherman happened to find and retrieve from the ocean a large, lidless marine cooler with bullet holes in it. He turned it over to the authorities in November, 1997 after a fishing friend brought to his attention a story about the Capano case in the newspaper. An employee at the marina in Stone Harbor recalled that she had sold a large quantity of gasoline to two men in a boat on the morning of June 28. The marina records, supporting her story, showed a sizeable cash purchase at about the time identified by Gerry. The Suburban belonging to Capano's wife [*11] was also seen in Stone Harbor that day. Significantly, Gerry waived the attorney-client privilege and allowed his attorney, Edmund D. Lyons, Esq., to testify. Lyons produced his notes showing that Gerry had told him substantially the same story long before the federal agents had raided Gerry's home and subjected him to the possibility of prosecution.

The State put before the jury an analysis showing that fibers from the rug in Capano's great room on the evening of June 27 were found in the Suburban. It produced a receipt dated Saturday, June 29 confirming that Capano had purchased a new rug that day. His housekeeper testified that she noticed the presence of a new rug and the absence of the love seat when she next cleaned after June 27.

The State called Capano's brother Louis as a witness. On Sunday, June 30, Capano told Louis that Fahey had slit her wrists at his home, and as a result his love seat was stained with her blood. Capano reassured him that she was okay and would be back to work on Monday. Capano asked Louis to make sure that the dumpsters at the construction site were emptied right away because Capano had disposed of the love seat and some of Fahey's personal belongings [*12] into one of them. On Monday, July 1, Louis ordered the dumpsters emptied even though they were not full.

On July 31, 1996, federal investigators, executing a search warrant for Capano's home on Grant Avenue, discovered two small spots of blood on a wall in the great room. The efforts of the authorities at DNA matching were initially stymied by the absence of a sample of Fahey's blood. It turned out that Fahey had recently donated blood to the Red Cross. It was retrieved from Europe where it

had been sent and was then compared to the blood found in Capano's home. DNA testing revealed that the odds of the small blood spots belonging to anyone other than Fahey were 1 in 11,000.

The jury also had before it evidence of Capano's behavior in prison after his arrest in November, 1997 and before his trial. He had repeatedly written letters to MacIntyre pleading with her to deny the gun purchase on his behalf. When she refused, he conspired with another inmate to have her house ransacked and burglarized. He went so far as to provide the entry code for her security system, the location of her valuables, and instructions to destroy particular fixtures and works of art.

Capano took the stand in his [*13] own defense at the conclusion of the State's case-in-chief. He denied that he killed Fahey and put the blame on MacIntyre. He testified that MacIntyre had accidentally shot and killed Fahey in the great room of his home on Thursday evening, June 27. According to Capano, after he and Fahey had dinner at a Philadelphia restaurant, they drove back to Wilmington where she stopped briefly at her apartment. They then proceeded to his home and watched television while sitting on the love seat in the great room. Fahey had taken off her pantyhose due to the heat. At some point he retrieved a phone message from MacIntyre, who wanted to come over to his home. Capano said that he called her back and told her not to do so. Nonetheless, using a key Capano had given her, she entered his house around 11:05 p.m. in a jealous rage. Capano stood up to confront her as Fahey began putting on her pantyhose and shoes. MacIntyre threatened to commit suicide, exclaiming, "I might as well kill myself. You deserted me." Capano related that he then observed her begin to lift her arm and realized she had a gun in her hand. He grabbed her arm and pushed it down. The gun MacIntyre was holding thereupon discharged [*14] a single time. Capano testified that Fahey, who was still sitting on the love seat in

the act of putting on her shoes, was struck by the bullet directly above her right ear. He insisted MacIntyre's killing of Fahey was an accident.

Capano took possession of the gun from MacIntyre, who told him she had thought it was unloaded. He then pulled Fahey to the floor, tried to perform CPR for at least twenty minutes to no avail, and used a flashlight to determine whether Fahey's eyes would dilate. Capano noted that he took these emergency measures despite knowing almost immediately that Fahey was dead. He therefore decided not to call 911. Around 11:30 p.m., he escorted MacIntyre to her car where he observed the gun's magazine. He took the magazine and sent her on her way home. He admitted that at this point he began planning a cover-up.

Capano recounted that after MacIntyre left he carried the marine cooler from his garage into the great room. By 11:45 p.m. that night he had stuffed Fahey's body inside the cooler. Thereafter, he drove at a high rate of speed to Fahey's nearby apartment and dropped off groceries and a gift he had given her that night. In an attempt to establish a false alibi [*15] for himself, Capano, upon returning home, called his law firm's answering machine service at 12:05 a.m., on Friday, June 28. According to his account, MacIntyre came back to his Grant Avenue house no later than 1:00 a.m. She helped him roll up the blood-stained carpet in the great room and move the cooler containing Fahey's body into the garage. Capano later hid the gun and magazine in the cooler with Fahey's body.

MacIntyre's testimony contradicted that of Capano. She explained she had spoken to Capano on the phone late on Thursday night, June 27, describing him as sounding agitated. She denied she was at Capano's house at any time that evening or had any knowledge of or involvement in Fahey's death or the ensuing cover-up. The State presented witnesses who corroborated that MacIntyre arrived at work at a local private school the next morning, Friday,

June 28 by 6:45 a.m. and that she seemed completely composed and normal in demeanor.

Capano admitted the accuracy of much of what Gerry recounted. He acknowledged that he had enlisted Gerry's help on Friday morning, June 28, that he and Gerry had driven the cooler containing Fahey's body to Gerry's house in Stone Harbor and that he had **[*16]** then used Gerry's boat to dispose of Fahey's body and the cooler at sea. He confirmed Gerry's testimony concerning the disposal of the love seat while adding information unknown to Gerry. Capano described how later in the day on Friday, June 28, when he was alone, he had discarded into a dumpster in New Jersey the blood-stained rug and the rags he had used to wipe up Fahey's blood.

On the other hand, Capano denied that Gerry had asked him on Friday morning, June 28 if he had "do[ne] it" or that he had nodded in the affirmative. He stated that he had never mentioned an extortion plot to Gerry or Joe and had never asked Gerry prior to June 28 if he could borrow the boat. As to the $ 8,000 he had borrowed from and later repaid to Gerry, it was to help Fahey pay for inpatient treatment for her eating disorder, but she refused the money. The defense presented an expert, Dr. Carol Tavani, who opined that Gerry's testimony was a classic case of "confabulation," in which a heavy drug user such as Gerry unwittingly fills gaps in memory with false memories. Not surprisingly, the defense made much of the fact that Gerry as well as Louis and MacIntyre had originally told the authorities and the **[*17]** Grand Jury stories unhelpful to the State and had later worked out favorable plea agreements in return for their cooperation.

To rebut the State's evidence of motive, Capano testified that he and Fahey had maintained a sexual relationship as late as June 22, 1996. He also attempted to explain away the State's evidence of planning. He said that he had bought the marine cooler in April, 1996, not as a repository for Fahey's body, but as a gift for Gerry for use on his boat. He had

delayed giving the cooler to Gerry with the idea of presenting it to him over the July 4th holiday at the New Jersey shore. He asserted that MacIntyre bought the gun not for him but rather for her own protection and against his advice. Finally, as set forth above, he described how MacIntyre had accidentally killed Fahey. He volunteered on direct examination that he had kept silent, not telling anyone for over two years, about the circumstances surrounding Fahey's death because of his overriding desire to protect MacIntyre, with whom he was "deeply in love."

The jury, believing the State's version of events and not Capano's, found him guilty of murder in the first degree. Capano now contends that he is entitled **[*18]** to relief on the basis of several alleged violations of his federal constitutional rights.

II.

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which placed restrictions on the power of federal courts to grant habeas corpus relief to state prisoners such as Capano. *See 28 U.S.C. § 2254.* The law took effect on April 24, 1996 and governs all petitions filed thereafter. *Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2001); 28 U.S.C. § 2254(d).* Capano filed his habeas corpus petition in this court on January 30, 2006.

Under *§ 2254(a)* a federal court may entertain habeas corpus applications from those persons in "custody pursuant to the judgment of a State court and to grant relief only on the ground that they are in custody in violation of the Constitution or laws or treaties of the United States." *28 U.S.C. § 2254(a); Werts, 228 F.3d at 195-96.* Before relief can be granted, however, a state prisoner must have exhausted available state remedies. *See 28 U.S.C. §§ 2254(b)(1)(A), (c).* Exhaustion requires a petitioner first to present fairly all federal claims through one complete round of the state appellate review process. *O'Sullivan v.*

*Boerckel, 526 U.S. 838, 845, 847, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999);* **[\*19]** *Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002).* To present a claim fairly, a petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice" of the federal claim that is being asserted. *McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999)* (citing *Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982)).*

In addition, a federal court cannot grant habeas corpus relief if the judgment of a state court denying relief on a claim rests on a ground that is independent of the merits of the federal claim and adequate to support that judgment. *Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).* A state procedural rule is "adequate" to support a state court judgment only if it was "firmly established and regularly followed" by the state courts at the time it was applied. *Ford v. Georgia, 498 U.S. 411, 424, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991).*

Even if a claim is adjudicated on the merits in a state court proceeding, federal habeas relief is barred unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision **[\*20]** that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*28 U.S.C. § 2254(d).* A state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" as delineated by the Supreme Court, or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and arrives at a different result. *Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 1995).* A state court ruling constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases but "unreasonably applies it to the facts of the particular state prisoner's case." *Williams, 529 U.S. at 407.* When making the "unreasonable application" inquiry, we must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Id. at 409.* Our Court of Appeals has stated that federal courts may "consider[] the decisions of the inferior federal courts when **[\*21]** evaluating whether the state court's application of the law was reasonable." *Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999).*

The Supreme Court recently clarified the test we must apply before granting relief where we find constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).*

*Fry v. Pliler, 127 S. Ct. 2321, 2328, 168 L. Ed.*

*2d 16 (2007)*. Thus, even if we conclude that constitutional error occurred in the state court, we may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht, 507 U.S. at 631*.

III.

The Superior Court judge charged the jury solely with respect to the crime of first degree murder, defined as "intentionally caus[ing] the death of another person." *Del. Code Ann. tit. 11, § 636(a)(1)*. [3] Under Delaware [*22] law, a person acts intentionally when "it is the person's conscious object to engage in conduct of that nature or to cause that result ...." *Id. § 231(a)(1)*. The jury therefore had the choice of convicting Capano on this charge or acquitting him.

> 3  We note that this definition is over-inclusive. An intentional killing committed where "the person acts under the influence of extreme emotional disturbance" is classified as manslaughter under Delaware law. *Del. Code Ann. tit. 11, § 632(3)*. Moreover, "[m]any who intend to, and do, kill are not criminally liable at all-those who act in self-defense or with other justification or excuse." *Lawrie v. State, 643 A.2d 1336, 1347 (Del. 1994)*.

Capano's first claim for habeas corpus relief asserts that the trial court violated his rights under the *Fourteenth Amendment to the Constitution*, as established in *Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980)*, when it refused his request to instruct the jury on lesser included offenses to the indicted charge of first degree murder. Because the claim was properly presented to and considered on the merits in the trial court and in the Delaware Supreme Court, Capano has satisfied the exhaustion requirement. *O'Sullivan, 526 U.S. at 845, 847*.

In [*23] *Beck*, the United States Supreme Court held that in a capital case, the *Eighth Amendment to the Constitution* as incorporated into the *Due Process Clause of the Fourteenth Amendment* requires that a jury be given the option of considering lesser included non-capital offenses when the evidence would have supported such verdicts. [4] *447 U.S. at 634-38*; *Hopper v. Evans, 456 U.S. 605, 611-12, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982)*. As the Supreme Court explained in *Schad v. Arizona, 501 U.S. 624, 646, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991)*, "Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." Forcing the jury to make the all-or-nothing choice introduces "a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Beck, 447 U.S. at 643*.

> 4  The *Eighth Amendment* states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const. amend. VIII*. The *Due Process Clause of the Fourteenth Amendment* mandates that [*24] no State shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV, § 1*.

Capano asked for jury instructions on three crimes that constitute lesser included offenses to the charged count of first degree murder: second degree murder, manslaughter, and criminally negligent homicide. Delaware law defines murder in the second degree as "recklessly caus[ing] the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life." *Del. Code Ann. tit. 11, § 635*. Manslaughter means "recklessly caus[ing] the death of another person" or "intentionally caus[ing] the death of another person under

circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance." *Id. § 632(1), (3).* A person acts "recklessly" "when the person is aware of and consciously disregards a substantial and unjustifiable risk ... [which] will result from the conduct." *Id. § 231(e).* Finally, criminally negligent homicide consists of causing, "with criminal negligence, ... the death of another person." *Id. § 631.* A person acts with criminal negligence "when the person fails to [*25] perceive a risk that ... will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id. § 231(a).*

Both the Superior Court and the Delaware Supreme Court ruled that Capano was not entitled to instructions on lesser included offenses. Under Delaware law, the jury must be charged on lesser included offenses in capital cases only if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." *Id. § 206(c).* The Delaware Supreme Court explained:

> The State argues that no evidence was presented of recklessness or criminal negligence, and that "the jury was not free to infer a state of mind from nonexistent evidence." Our independent review of the evidence at trial confirms the accuracy of the State's view. There is no such evidence. To permit the jury to find the elements of the lesser included offenses on this record would permit unguided speculation by the jury.

*Capano v. State, 781 A.2d 556, 630-31 (Del. 2001).* That Court was cognizant [*26] of the federal due process issue presented by *Beck.* It observed that the language of the Delaware statute is drawn almost verbatim from the United States Supreme Court's *post-Beck* decision in *Hopper v. Evans, 456 U.S. 605, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982). Hopper* held that a lesser included offense instruction should be given "if the evidence post-conviction would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Hopper, 456 U.S. at 612.* Because the Delaware Supreme Court found no rational basis in the evidence to support Capano's desired instructions under Delaware law, it concluded that no such basis existed under the similar federal constitutional standard. *Capano, 781 A.2d at 633-34.*

Capano, as previously noted, was convicted of first degree murder and sentenced to death by the trial judge on the jury's recommendation. After Capano's death sentence was overturned in a post-conviction proceeding, *Capano v. State, 889 A.2d 968 (Del. 2006),* he was resentenced to life imprisonment without the possibility of parole. He argues that a rational basis for his requested points for charge did exist in the evidence, namely, that the jury could have found his actions to be criminally [*27] reckless or criminally negligent based either on "gaps" in the State's evidence or on his own "accident" account of the events of June 27, 1996. We treat the issue of the sufficiency of the evidence for a lesser included offense instruction as one of law. *See, e.g., Hogan v. Gibson, 197 F.3d 1297, 1306 n.6 (10th Cir. 1999).*

First, Capano suggests that the jury could have disbelieved certain portions of the State's evidence as to intent, thus leaving gaps as to what actually occurred at Capano's home on the night of June 27, 1996. This is true. Nonetheless, it does not follow that the jury may fill in those gaps with speculation. The record is entirely devoid of any evidence supporting a finding that Capano killed Fahey as a result of recklessness, extreme emotional

disturbance, or criminal negligence. It is undisputed that the prosecution's case was sufficient to establish motive, planning, and consciousness of guilt and to establish an intentional killing by Capano constituting first degree murder. While the jury was free to disbelieve the State's evidence, it was not free to create a scenario with no factual support to convict on a lesser included charge. Simply put, the only option [*28] other than conviction of first degree murder available to the jury on the record before it was to find that the State had not proven first degree murder beyond a reasonable doubt, either because the State's evidence in and of itself was insufficient or because the jury believed that Fahey had died at the hand of MacIntyre with no culpability on the part of Capano. Consequently, the jury could only rationally have found Capano guilty of first degree murder or have acquitted him.

Second, Capano asserts that a jury could have viewed his attempt to prevent MacIntyre from engaging in an apparent suicide attempt as either reckless or criminally negligent behavior on his part. The Delaware Supreme Court described Capano's testimony as being "confined to an accident scenario that involved no crime on his part." Again, Delaware law provides that an act is committed recklessly only if the actor "consciously disregards a substantial and unjustifiable risk ...." An act consists of criminal negligence where a person fails to perceive a risk "of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the [*29] situation."

Capano directs us to *Hall v. State, 431 A.2d 1258 (Del. 1981)*, in which the defendant shot his mother between the eyes from a distance of approximately six inches and was charged with first degree murder, second degree murder, manslaughter, and negligent homicide. Despite the defendant's testimony that the gun had accidentally discharged, he was convicted of first degree murder. Capano cites *Hall* for the proposition that there is such a thing as a "reckless accident," that is, an accident that negates the culpable state of mind for one charge but supports a verdict on some lesser charge. We agree. The facts of *Hall,* however, are a world removed from those presented here. In this case, Capano, if his testimony is to be believed, never had possession of the firearm, much less pointed it at Fahey. Rather, he attempted to prevent a purportedly suicidal woman from shooting herself. While the facts of *Hall* offered a rational basis for jury instructions on lesser included offenses, the facts here simply do not.

Capano also cites *Henry v. State, 805 A.2d 860, 865 (Del. 2002)*, in which the defendant, charged with first degree murder, killed his wife by shooting her three times at [*30] close range. He argued that he had not intended to kill her and that he was entitled to an instruction on second degree murder because a jury could find that his conduct was reckless under circumstances which manifest a cruel, wicked, and depraved indifference to human life rather than intentional. The trial court rejected that argument, calling the defendant's story "absurd." The Delaware Supreme Court reversed. It held that the jury could have believed the defendant's testimony and returned a verdict of second degree murder. Because Capano's story, even if fully believed, would not have warranted a jury instruction on lesser included charges, *Henry* is inapplicable.

Finally, Capano cites to *Wright v. State, No. 84-2007, 2008 Del. LEXIS 61, at *2 (Del. Feb. 7, 2008)*. There, the defendant had engaged in an argument with an acquaintance in a parking lot. Drawing a handgun, the defendant fired between five and ten shots at the man and killed an innocent bystander in the process. *Id. at *2*. Capano cites the case presumably because the defendant was charged with first and second degree murder despite his protests that the shooting was an accident. The Delaware Supreme Court held that because

[*31] the defendant's conduct "could not have fallen below recklessness or criminal negligence," he was not entitled to a jury instruction on accident. *Id. at *15*. It hardly needs saying that the defendant's conduct in *Wright,* which involved discharging a firearm multiple times in a populated parking lot, bears no similarity to Capano's description of what happened here.

No Delaware precedent called to our attention suggests that Capano, under his rendition of the facts, committed any act which runs afoul of the State's homicide statutes. The cases referenced by Capano all involve situations where the defendant actively possessed a firearm and pointed it toward the victim. *See Wright, 2008 Del. LEXIS 61, at *2; Henry, 805 A.2d 860, 862-63; Hall, 431 A.2d 1258, 1258-59.* That was not the situation here. Accordingly, it was not objectively unreasonable for the Delaware Supreme Court to decide that Capano's alleged attempt to disarm a woman threatening suicide provided no rational basis for a jury instruction on second degree murder, manslaughter, or criminally negligent homicide. Again, while the jury had the right to disbelieve Capano's story about how Fahey died on the night of June 27, 1996, [*32] it may not substitute a different version or draw inferences that have no support in the record.

The Delaware Supreme Court's *Beck* determination was not an objectively unreasonable application of the law as determined by the United States Supreme Court. Moreover, to the extent that we must decide whether there was an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding, we find that the Delaware Supreme Court did not make an unreasonable determination. *See 28 U.S.C. § 2254(d)(2).* Consequently, we will deny relief to Capano on the basis of his *Beck* claim. [5]

5  The Supreme Court has not addressed

the applicability of *Beck* where a defendant such as Capano has a sentence of death later reduced to life imprisonment. It may very well be that *Beck* does not apply to non-capital cases. *See, e.g., Schad v. Arizona, 501 U.S. 624, 646-47, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991); Bagby v. Sowders, 894 F.2d 792, 796-97 (6th Cir. 1990); Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988); Chavez v. Kerby, 848 F.2d 1101, 1103 (10th Cir. 1988); Perry v. Smith, 810 F.2d 1078, 1080 (11th Cir. 1987).* However, in *Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988)*, which was decided [*33] prior to *Schad,* our Court of Appeals held that *Beck* does apply in non-capital cases. In light of our holding, we need not decide that issue here.

IV.

In his second claim before us, Capano argues that the admission at his trial of certain out-of-court statements made by Fahey violated his right under the *Confrontation Clause of the Sixth Amendment to the Constitution* as incorporated into the *Fourteenth Amendment.* The *Confrontation Clause* states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." *U.S. Const. amend. VI.* Capano raised this argument at trial and presented it to the Delaware Supreme Court on direct appeal. He has thus exhausted his state remedies in this regard. *O'Sullivan, 526 U.S. at 845, 847.*

*Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)*, sets forth the clearly established law governing the admission of the hearsay statements in light of the *Confrontation Clause.* [6] *See, e.g., McCandless, 172 F.3d at 264-65.* In *Roberts,* the Supreme Court held that the *Confrontation Clause* allows the admission of hearsay against criminal defendants if the evidence falls within a "firmly rooted hearsay exception" or

possesses "particularized **[*34]** guarantees of trustworthiness." *448 U.S. at 66.* A hearsay exception is "firmly rooted" if "longstanding judicial and legislative experience" has shown that statements admitted pursuant to the exception carry special guarantees of trustworthiness essentially equivalent to those produced by cross-examination. *Idaho v. Wright, 497 U.S. 805, 815, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see White v. Illinois, 502 U.S. 346, 355 n.8, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992).* Even if a statement does not fall within a "firmly rooted hearsay exception," it may still satisfy the *Confrontation Clause* if it possesses "particularized guarantees of trustworthiness" such that cross-examination is unnecessary to ascertain the statement's reliability. *Roberts, 448 U.S. at 66 n.9.*

> 6    The Supreme Court partially overruled *Roberts* when it held that the admission of certain "testimonial" hearsay statements violates the *Confrontation Clause. See Crawford v. Washington, 541 U.S. 36, 68-69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).* It is undisputed that no testimonial statements are at issue here.

Under Delaware law, "[i]n a **[*35]** prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent." *Gattis v. State, 637 A.2d 808, 818 (Del. 1994).* At trial, the prosecution offered testimony in its case-in-chief from numerous witnesses to whom Fahey had described her relationship with Capano and her feelings concerning it. The State's purpose was to demonstrate that Fahey had ended their intimate relationship over Capano's objection and that he thus had a motive to kill her.

Jill Morrison, Fahey's friend, recounted that Fahey thought that Capano was trying to control her life and that he "was upset ... because she was dating Mike [Scanlan] ...."

Morrison further related Fahey's descriptions of an incident in which Capano climbed Fahey's fire escape and entered her apartment in an attempt to reclaim gifts and another in which he parked his vehicle in his garage, with Fahey in the passenger seat, and locked the car doors as they argued about their relationship. Fahey's friend Siobhan Sullivan said that Fahey called Capano "a possessive, controlling maniac" and later "very adamantly" said, "He's **[*36]** fucking stalking me." Other friends attested to Fahey's statements expressing a desire to end her relationship with Capano.

The prosecution called as witnesses a psychiatrist, Dr. Neil Kaye, and two psychologists, Dr. Michele Sullivan and Dr. Gary Johnson (collectively, "the psychotherapists"), all of whom had professionally treated Fahey while she was dating Capano. Each of them testified as to statements made by Fahey during the course of diagnosis and treatment. These statements, like those made to her friends, included both general descriptions of Fahey's feelings toward Capano and accounts of particular incidents involving him. For example, Dr. Kaye testified that in June, 1996, "[Fahey] was clear in her mind that she did not want to have a relationship with Mr. Capano. She was still fearful of him, was not convinced that he was ever going to let go ...." Dr. Kaye further noted that "she was genuinely fearful ... that harm would come to her if she broke things off ..." and that "she was trying to find a way to let him down easy ... because she was worried about rage and anger."

Similarly, Dr. Sullivan testified that Fahey sought to end her involvement with Capano because he was "incredibly **[*37]** controlling and possessive," so much so that Fahey considered him to be "haunting her" with a plethora of emails, phone calls, and unexpected visits. According to Dr. Sullivan, Fahey was concerned that Capano would have her kidnapped.

Dr. Johnson, like Jill Morrison, related

Fahey's account of the incident in which Capano attempted to reclaim gifts from Fahey's apartment. He testified that Fahey was "quite terrified" because a prominent married man whom she was dating "had come to her apartment quite late at night ... bolted the door shut and kept her inside for ... three or four hours during which time he yelled at her, threatened to expose their relationship ...." Dr. Johnson added that Fahey "felt very much controlled by" the man and that Fahey "began to want to pull away from that relationship, [but] that he was unwilling to let her do so."

Significantly, the prosecution introduced a considerable amount of hearsay evidence by stipulation, including Fahey's diary, emails between Fahey and Capano, and the testimony of Fahey's close friend Kim Lynch-Horstmann. Lynch-Horstmann stated that in December, 1995, Capano "would **[*38]** e-mail [Fahey] at work all the time and they were kind of obsessive e-mails." Fahey told her that Capano would threaten suicide if she tried to end the relationship. Further, Fahey felt she might have to move out of the state to escape Capano's control. Lynch-Horstmann repeated Fahey's account of the incident in which Capano climbed the fire escape:

> [Capano] tried to remove all of the gifts that he had given Annie from her apartment because he didn't want another man watching the TV that he had given her, the clothes --seeing Annie wear the clothes that he had given her, so he removed a lot of those things from her apartment.

Based on what Fahey told her, Lynch-Horstmann recounted that Capano would "attack her insecurities and refer to her as white trash" and tell her "that she should be lucky that he's even going out with her because of who he is and what he could buy and where she came from."

The statements introduced by stipulation from Fahey's emails and diary were similar. For example, in an email message to Capano on February 12, 1996, Fahey wrote: "Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half **[*39]** hour ...." In a diary entry dated February 23, 1996, Fahey expressed a fear that "[Capano] would fly off the handle again" and on April 7 recorded that Capano was "a controlling, insecure, jealous maniac ...."

The trial judge overruled Capano's objections to the non-stipulated admission of Fahey's statements to her friends, family, and psychotherapists. Nevertheless, he repeatedly delivered timely and appropriate limiting instructions as to the purpose for which the evidence in issue could be used, that is, to prove that Fahey was attempting to extricate herself from her relationship with Capano and that he thus had a motive to kill her. The judge stressed that the statements were not introduced to prove the truth of the underlying facts, of Capano's bad character, or of his state of mind.

> 7    After Dr. Kaye's testimony, the trial court instructed the jury that, "Members of the jury, I want to remind you of a warning I gave you earlier in response to an objection that was made by the defense. The purpose of this evidence is to examine the mental state, the emotional state of Anne Marie Fahey ... it in no way reflects as evidence of any actions or any state of mind on behalf of the defendant. **[*40]** This deals solely with Miss Fahey, not with Mr. Capano."

> Prior to Jill Morrison's testimony, the court also instructed the jury, "You may not consider the evidence [of Capano's obsessive behavior] as proof that the defendant is a bad person, and therefore, probably committed the offense with which he is charged."

On direct appeal, the Delaware Supreme Court first considered whether Fahey's statements were properly admitted under *Rule 803(3)* of the Delaware Rules of Evidence ("D.R.E."), the "state of mind" exception, which allows the admission of any

> statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed ....

This rule is the same as *Rule 803(3) of the Federal Rules of Evidence.* The Court distinguished Fahey's statements describing her then existing state of mind, such as those indicating she was afraid of Capano, from her statements of fact or memory that gave rise to that state of mind, such as her descriptions of his obsessive behavior. The Court concluded that Fahey's statements **[*41]** in the former category were properly admitted in the State's case-in-chief under D.R.E. 803(3) while those in the latter category were not.

The Delaware Supreme Court then addressed whether the admission of these state of mind statements violated the *Confrontation Clause* under *Roberts.* It concluded that because D.R.E. 803(3) is a firmly rooted hearsay exception, the statements properly admitted pursuant to the Rule did not give rise to any constitutional infringement. The Court determined, however, that the trial court's admission of Fahey's statements of fact or past events was evidentiary error under D.R.E. 803(3) and also violated Capano's *Confrontation Clause* right. Nonetheless, the Court decided their introduction to be harmless error beyond a reasonable doubt under *Chapman v. California, 386 U.S. 18, 87 S. Ct.*

*824, 17 L. Ed. 2d 705 (1967)* since they were largely cumulative of stipulated evidence.

The Delaware Supreme Court went on to rule that all of Fahey's statements to her psychotherapists, including those containing factual assertions, were admissible under D.R.E. 803(4), which is identical to *Rule 803(4) of the Federal Rules of Evidence* and allows the following hearsay evidence:

> [s]tatements made for purposes **[*42]** of medical diagnosis or treatment and describing medical history, or past or present symptoms or sensations, or the inception or general character of the cause or external causes thereof insofar as reasonably pertinent to diagnosis or treatment.

The Court further reasoned that the statements had sufficient "particularized guarantees of trustworthiness" to satisfy the second *Roberts* prong. [8]

> 8     The Delaware Supreme Court declined to reach the issue of whether, for *Confrontation Clause* purposes, *Rule 803(4)* was a "firmly rooted hearsay exception" with respect to statements made to psychotherapists.

Capano does not contest that *Rule 803(3)* is a firmly rooted hearsay exception under *Roberts.* [9] Instead, he argues that it was constitutional error to allow the admission of Fahey's statements of past events under D.R.E. 803(3). The Delaware Supreme Court agreed but concluded that the error was harmless. We must now review the error to determine if it "had substantial and injurious effect or influence in determining the jury's verdict." *See Fry, 127 S. Ct. at 2328; Brecht, 507 U.S. at 631.* In doing so, there must be more than "mere speculation that the defendant was prejudiced by trial error; the **[*43]** court must

find that the defendant was actually prejudiced by the error." *Calderon v. Coleman, 525 U.S. 141, 146, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998).*

> 9   The "state of mind" exception to the hearsay rule has a well-established pedigree, having been discussed by the United States Supreme Court as early as 1892 in *Mutual Life Ins. Co. of N.Y. v. Hillmon, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892).* It has since been codified in both the Delaware and Federal Rules of Evidence. *See* Del. R. Evid. 803(3); *Fed. R. Evid. 803(3).* Several Courts of Appeals have found it to be "firmly rooted." *See Horton v. Allen, 370 F.3d 75, 85 (1st Cir. 2004).*

The properly admitted evidence presented at trial of Capano's controlling, manipulative, and obsessive nature was legion. As noted above, many of Fahey's out-of-court statements were introduced by stipulation in the form of Fahey's diary, Kim Lynch-Horstmann's testimony, and the emails between Fahey and Capano. Capano apparently thought some of this information would be helpful to him. Each of these sources of evidence contained both generalized comments on Capano's nature and detailed accounts of specific behavior. They painted Capano in an extremely unflattering light. Capano's negative attributes were also **[*44]** on prominent display in Capano's own writings from prison to MacIntyre, her teenage son, and Susan Louth, another of Capano's former mistresses. His vindictive nature was exemplified by his attempt from prison to have MacIntyre's house ransacked and burglarized, which was described in detail through properly admitted evidence. As such, the wrongly admitted evidence provided the jury with nothing that was not available from other credible, properly admitted sources. We emphasize again that the trial judge gave appropriate limiting instructions, which reduced the likelihood of any prejudice.

Capano relies on *United States v. Lopez,* in

which our Court of Appeals reviewed for harmless error the ruling of the district court which it concluded had erroneously admitted hearsay at trial. *340 F.3d 169 (3d Cir. 2003).* There, the Government introduced an out-of-court statement made to a prison official by a nameless tipster that the defendant had contraband in his cell. The Court of Appeals observed that the statement was the only evidence upon which the jury could find that an "invisible, presumably disinterested witness" corroborated the government's position. In reversing the conviction, the **[*45]** Court characterized the inadmissible statement as the "cement" that held together the jury's verdict. *Lopez, 340 F.3d at 177.* Here, by contrast, the wrongly admitted evidence was almost entirely cumulative in subject matter. The improperly admitted hearsay statements did not serve to "cement" an otherwise tenuous case.

The erroneous admission of certain of Fahey's out-of-court statements under D.R.E. 803(3) did not have "a substantial and injurious effect or influence in determining the jury's verdict" under *Brecht, 507 U.S. at 631.* Thus, we will deny relief to Capano on that basis.

Capano further contends that his constitutional right of confrontation was also violated under *Roberts* by the admission of Fahey's statements to her psychotherapists under D.R.E. 803(4). While the Delaware Supreme Court concluded that Fahey's statements about past events were inadmissible under D.R.E. 803(3), it determined that they were admissible pursuant to D.R.E. 803(4) and possessed sufficient "particularized guarantees of trustworthiness" under the second *Roberts* prong to satisfy the *Confrontation Clause.*

The United States Supreme Court has held that the hearsay exception for "statements made for purposes **[*46]** of medical diagnosis or treatment," as embodied in the identical *Rule 803(4) of the Federal Rules of Evidence,* is firmly rooted for *Confrontation Clause* purposes. *White, 502 U.S. at 356 n.8.* While Fahey's psychiatrist, Dr. Kaye, was a physician,

Dr. Sullivan and Dr. Johnson, who also saw Fahey, were psychologists and not medical doctors. The Court has not reached the specific issue of whether *Rule 803(4)* is applicable or firmly rooted as to statements made to psychologists for purposes of diagnosis or treatment. In any event, the Court has provided ample guidance to suggest that it would not exclude such statements admitted here at least under the second *Roberts* test.

In *Idaho v. Wright,* the United States Supreme Court noted that the "particularized guarantees of trustworthiness" required for admission under the *Confrontation Clause* should be "drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).* A trial court has "considerable leeway" in weighing the relevant circumstances. *Id. at 822.* The Supreme Court, by way of example, stated that "spontaneity and consistent repetition"  **[*47]** and a "lack of motive to fabricate" are permissible factors to consider in examining the totality of the circumstances. *Id. at 821-22.*

The Delaware Supreme Court cited as persuasive the fact that "Fahey made the statements to her psychotherapists in a natural manner during therapy sessions," with "nothing to indicate that Fahey made the statements under suspicious circumstances or in a manner suggesting that she had sinister motives." The Court considered the "spontaneity and consistent repetition" of the statements and noted "that Fahey made nearly identical statements concerning her intentions and her emotional state to a number of her psychotherapists and friends." In view of the presence of several *Wright* factors and the considerable leeway that must be accorded the trial court, the Delaware Supreme Court's determination that Fahey's out-of-court statements to her psychotherapists satisfied the *Confrontation Clause* was not an objectively unreasonable application of clearly established United States Supreme Court precedent.

As his final argument under the *Confrontation Clause,* Capano argues that the Delaware Supreme Court erred in allowing the introduction of Fahey's statements in  **[*48]** the State's case-in-chief, rather requiring their introduction to be deferred until the State's rebuttal. He maintains that such evidence is unfairly prejudicial when it is not delayed until after a defense such as accident is raised. The Delaware Supreme Court disagreed. It held that it was relevant to the State's effort to show that Fahey had sought to end her romantic relationship with Capano and that he had a motive, as a rejected lover, to kill her.

The United States Supreme Court has not addressed whether under some circumstances statements properly admitted under *Rule 803(3)* must, as a constitutional matter, be delayed by the State until it presents its rebuttal case. Further, as far as we know, no holding of any lower federal court espouses Capano's desired result. Given the complete lack of clearly established United States Supreme Court precedent supporting Capano's position, the Delaware Supreme Court's decision allowing the admission of hearsay statements under *Rule 803(3)* in the State's case-in-chief does not provide Capano with a basis for relief under *28 U.S.C. § 2254.*

In sum, Capano's right to confront the witness against him under the *Confrontation Clause* was violated  **[*49]** by the improper admission of certain hearsay evidence under Rule 803(3). However, in light of the properly admitted evidence which included the voluminous stipulations as well as Fahey's trustworthy statements to her psychiatrist and two psychologists, the violation did not have "a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht, 507 U.S. at 631.* Accordingly, Capano's claim under the *Confrontation Clause* merits no relief.

V.

Capano's final claim for relief under *28 U.S.C. § 2254* challenges the prosecution's cross-examination of him at the trial concerning his post-arrest silence at his bail hearing in February, 1998. He asserts that his due process rights were violated under the *Fourteenth Amendment* to the *Constitution. U.S. Const. amend. XIV, § 1*. In *Doyle v. Ohio*, the United States Supreme Court held that "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the *Due Process Clause of the Fourteenth Amendment*." *426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)*; see *Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)*.

On direct examination, Capano professed that he remained silent for more than two years after **[*50]** Fahey's death, including at his five-day bail hearing that began on February 2, 1998, out of a desire to protect MacIntyre and his brother Gerry. On cross-examination, the prosecutor then sought to impeach Capano on the proffered rationale. The colloquy during the trial transpired as follows:

> Q: And then February 27, 1998, after you are arrested, Debbie MacIntyre signs a cooperation agreement with the Government, right?
>
> A: Yes, she does. I didn't hear the date you said.
>
> Q: February 27, 1998?
>
> A: Yeah, I don't know if that's the date she signed. I know that's the date she went in. For all I know she had signed it the day before.
>
> Q: You kept quiet at the bail hearing which preceded this, right? There was a bail hearing in February to decide whether you would stay in jail. You never said she did it, right?

> A: I never testified.
>
> Q: But you never said it through any means. You never told your attorneys, you never did anything?
>
> A: No, I was true to my word. I was protecting her.
>
> Q: You were protecting her. February 27th she signs a cooperation agreement with the State?
>
> A: Yes.
>
> Q: And you're in jail?
>
> A: Yes.
>
> Q: You have-according to your testimony, it's been horrible conditions that you've endured in jail, **[*51]** right?
>
> A: Very terrible.

Capano failed to object to this line of questioning at trial. However, he presented his claim of improper cross-examination to the Delaware Supreme Court on direct review and thus has satisfied the exhaustion requirement. *O'Sullivan, 526 U.S. at 845, 847*.

The State maintains the Delaware Supreme Court disposed of Capano's improper cross-examination claim pursuant to Delaware Supreme Court Rule 8. The State argues that this ruling constitutes an independent and adequate state ground which precludes this Court from granting federal habeas corpus relief. *Coleman, 501 U.S. at 729*. Rule 8 provides:

> Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so

presented.

The Delaware Supreme Court has interpreted the "interests of justice exception" contained in Rule 8 to call for "plain error" review before the Court will excuse default in failing to raise an issue at the trial level. "[T]he error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." **[*52]** *Wainwright v. State, 504 A.2d 1096, 1100 (Del. 1986).* Our Court of Appeals has recently held that a finding of no plain error pursuant to Delaware Supreme Court Rule 8 when the issue has not been preserved below constitutes an independent and adequate state ground which forecloses federal review under *28 U.S.C. § 2254. Campbell v. Burris, 515 F.3d 172, 182 (3d Cir. 2008).*

The Delaware Supreme Court did not specifically reference Rule 8 in deciding on direct appeal Capano's claimed violation of his right to post-arrest silence. Nonetheless, the heading in the relevant section of its voluminous opinion was "Questions Concerning Post-Arrest Silence - No Plain Error." *Capano v. State, 781 A.2d 556, 647 (Del. 2001).* The Court explained that "[b]ecause no objection was raised at trial, we review this claim for plain error." *Id.* It immediately thereafter cited its decision in *Wainwright,* the case in which it announced that Rule 8 requires "plain error" review where the appellant failed to object at trial.

While noting Capano's waiver at trial, the Court necessarily proceeded to delve into the merits. Otherwise, it would not have been able to decide if the Superior Court judge had committed **[*53]** plain error. There is no doubt that the Delaware Supreme Court reviewed Capano's claim for plain error and found none. Such review constitutes an independent and adequate state ground for denial of relief. *Campbell, 515 F.3d at 182.* Consequently, we are precluded from reviewing this claim in a

collateral proceeding under *§ 2254* unless Capano establishes cause for his procedural default and actual prejudice or shows that a miscarriage of justice will result if we refuse to hear his claim. *See Coleman, 501 U.S. at 750.* Capano has not alleged cause for his procedural default and is unable to demonstrate that a miscarriage of justice will result from our refusal to hear his claim.

Even if we may review the substance of Capano's claim, we find it to be meritless. The United States Supreme Court in *Doyle* made clear that cross-examination as to post-arrest silence is improper only where it is used to "impeach the exculpatory story." *426 U.S. at 619 n.11.* The Court explained that the use of a defendant's post-arrest silence to impeach an exculpatory story disclosed shortly before or at trial would be "fundamentally unfair because Miranda warnings inform a person of his right to remain silent **[*54]** and assure him, at least implicitly, that his silence will not be used against him." *Anderson v. Charles, 447 U.S. 404, 407-08, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980).* This rationale is not applicable here.

In this case, Capano opened the door to a discussion of his post-arrest silence not only by repeatedly referencing it on his direct examination but by making it a keystone of his defense. He stressed that the motivation for his post-arrest silence, including his silence at his February, 1998 bail hearing, was to protect MacIntyre from suffering legal repercussions for her role in Fahey's death. Yet, Capano had also stated on direct examination that he was enormously disappointed by MacIntyre's failure to testify at the bail hearing, particularly after he had given her so many detailed instructions to follow at that proceeding. He further described a dramatic and negative shift in the tone of MacIntyre's communications to him beginning on January 28, 1998, a few days before the bail hearing took place.

The State on cross-examination impeached the credibility of Capano's proffered explanation for his continued silence at the bail

hearing when his relationship with MacIntyre had noticeably deteriorated by that time **[*55]** and he knew she was no longer willing to be a witness on his behalf. Under the circumstances, the State's questioning was in no way "fundamentally unfair" and did not infringe Capano's right to remain silent after his arrest. We conclude that the State's limited cross-examination of Capano regarding his post-arrest silence did not result in a constitutional violation.

In any event, even if there were constitutional error, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht, 507 U.S. at 631.* Capano is not entitled to relief on his *Doyle* claim.

## VI.

For the reasons discussed above, Thomas J. Capano has not demonstrated that he is entitled to relief. Accordingly, we will deny his petition

for a writ of habeas corpus under *28 U.S.C. § 2254.* We will not issue a certificate of appealability.

## *ORDER*

AND NOW, this 15th day of April, 2008, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the petition of Thomas J. Capano for a Writ of Habeas Corpus under *28 U.S.C. § 2254* is DENIED; and

(2) a certificate of appealability is not issued.

BY THE COURT:

/s/ Harvey Bartle III

HARVEY BARTLE III C.J.

SITTING BY DESIGNATION

# CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2008, I served the foregoing Application for Certificate

of Appealability on the following by First Class Mail, postage prepaid.

       Elizabeth R. McFarlan, Esquire
       Department of Justice
       820 N. French Street
       Wilmington, DE 19801

                                                        *Joseph M Bernstein*
                                          JOSEPH M. BERNSTEIN (Bar #780)
                                          800 N. King Street - Suite 302
                                          Wilmington, DE 19801
                                          302-656-9850
                                          E-mail: jmbernstein@embarqmail.com