# IN THE UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT



**THOMAS J. CAPANO,**
Appellant,

v.

: Case No. 08-2282

**PERRY PHELPS**, Warden,
Delaware Correctional Center
and **JOSEPH R. BIDEN, III,** Attorney
General of the State of Delaware,
Appellees.

## COMBINED PETITION FOR PANEL REHEARING AND FOR REHEARING EN BANC

Thomas J. Capano ("Capano"), the above named Appellant, hereby petitions the Court to grant panel rehearing or to grant a rehearing *en banc* from the Panel Decision dated July 29, 2008 in the above captioned appeal. The grounds and authorities in support of this petition are set forth as follows:

### Procedural History

In January 1999, Capano was convicted in the Delaware Superior Court of a single charge of First Degree Murder concerning the death of Anne Marie Fahey ("Fahey"), the scheduling secretary of the State's then-Governor, Thomas R. Carper. Following a "penalty hearing," the Court sentenced Capano to death. See, *State v. Capano,* 1999 Del. Super. LEXIS 541. Capano's conviction and death sentence were affirmed by the Delaware Supreme Court on direct appeal *Capano v. State*, 781 A.2d 556 (Del. 2001), *cert. denied,* 536 U.S. 958 (2002) ("*Capano II*"). In a subsequent state court post-conviction proceeding, the Delaware Supreme Court vacated Capano's death sentence and remanded for a new penalty hearing. See, *Capano v. State*, 889 A.2d 968 (Del. 2006). When the State elected not to proceed with a second penalty hearing, Capano was resentenced to life in prison without the possibility of parole.

Thereafter, Capano filed a timely petition in the District Court below for habeas corpus relief under 28 U.S.C. §2254. In the Habeas Petition, Capano claimed that Delaware courts violated his rights under the Fourteenth Amendment, as established in *Beck v. Alabama*, 447 U.S. 625 (1980)

and its progeny, by refusing his request to instruct the jury on lesser included offenses to the indicted charge of First Degree Murder (hereinafter "*Beck* Claim"). See, *Capano v. Carroll*, 2008 U.S. Dist. LEXIS 32648, *22 ("*Habeas Decision*"). The Habeas Petition was denied by the District Court on April 15, 2008. *Id.*, at *55. The District Court also declined to issue a Certificate of Appealability ("COA"). *Id.* Thereafter, Capano filed a timely appeal to this court from the *Habeas Decision* and a separate Application for a COA.[1] On July 29, 2008, a Panel of this Court issued a decision and Order to deny the application for a COA (hereinafter "*Panel Decision*").[2]

## Grounds for Panel Rehearing

In providing for the possibility of Panel rehearing, *FRAP, Rule 40* attempts to balance the interest in finality of judicial decisions with the recognition that courts sometimes err. Panel rehearing should be granted if the petitioner can show that the panel has overlooked or misapprehended an issue or argument that might reasonably alter the decision made by the court. *FRAP, Rule 40(a)(2). Cf., Donald M. Durkin Contracting, Inc. v. City of Newark*, 2006 U.S. Dist. LEXIS 68221 (D. Del. 2006) (Court should not hesitate to grant [reargument] "if it overlooked facts or precedent that reasonably would have altered the result"). This is such a case.

## Argument in Support of Panel Rehearing

## The Panel Did Not Understand its Limited Role in Passing on a COA Application

The only issue presented to the Panel was whether this Court should issue a COA from the District Court's ruling on the *Beck* Claim.[3] The standard for the issuance of a COA, either by a

---

[1] The application for a COA was limited to the *Beck* Claim.

[2] The *Panel Decision* is attached as Exhibit No. 1. Because the *Panel Decision* relied entirely on the District Court's *Habeas Decision* to deny a COA, it would be impossible for the court en banc to conduct any meaningful or fair review of the *Panel Decision* without having the District's Court's *Habeas Decision* before the court en banc. Therefore, a copy of the District Court's *Habeas Decision* is also attached to this Petition for Rehearing as Exhibit No. 2.

[3] A proceeding to determine whether a COA should issue is separate and distinct from a decision on the merits of an appeal. See, *Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003)("COA determination is a separate proceeding, one distinct from the underlying merits"). Until a COA has been issued, federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners.
(continued...)

District Court judge or a judge of a Circuit Court of Appeals,[4] was explained by the Supreme Court

in *Miller-El*:

> A prisoner seeking a certificate of appealability must demonstrate "a substantial showing of the denial of a constitutional right." 28 *U.S.C.* §2253(c)(2). "**A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.**"

*Id.*, 537 U.S., at 327.

Although the *Panel Decision* cites to *Miller-El*, the language of the Panel's holding makes

it abundantly clear that the Panel misunderstood its role, as circumscribed by *Miller-El*, in passing

on Capano's application for a COA:

> For the reasons stated by the District Court, Capano has not made a substantial showing of the denial of a constitutional right as a result of the Delaware state court's decision not to instruct the jury on lesser included offenses to first degree murder. See, *Miller-El. v. Cockrell*, 447 U.S. 625 (2003). The decision that lesser included offense instructions were not required because they lacked an evidentiary basis in the record was not contrary to, or an unreasonable application of, the Supreme Court's precedent in *Beck v. Alabama*, 447 U.S. 625 (1980), and its progeny.

Under the plain language of *Miller-El*, the requirement that Capano make "a substantial

showing of the denial of a constitutional right **is satisfied** if "jurists of reason could disagree with

the district court's resolution of his constitutional claims, or that jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." *Id.*, 537 U.S., at 327.

Conversely, the "unreasonable application...of *Beck*" standard employed by the Panel in denying a

COA is the standard that a petitioner must meet in order to be granted **final** habeas relief.[5]  In other

---

[3](...continued)
See, 28 *U.S.C.* § 2253.

[4] Even though this appeal was assigned to a Panel of three judges, a single judge can issue a COA. See, 28 *U.S.C.* §2253(c); *Third Circuit Local Appellate Rule 22.3*.

[5] See, *Matteo v. Superintendent. SCI Albion*, 171 F.3d 877, 891 (3d Cir. 1999) (en banc) (stating the
(continued...)

words, instead of analyzing the *Habeas Decision* under the "reasonably debatable" standard established in *Miller-El*[6], the Panel wrongly required Capano to prove, at the COA stage of the proceeding, that he will prevail on the ultimate question at issue in the appeal – whether the "Delaware state court's decision not to instruct the jury on lesser included offenses to first degree murder...was contrary to or an unreasonable application of *Beck*." The Panel's error in this case was twofold: (1) as discussed above, the Panel failed to employ the "reasonably debatable" standard of review mandated under *Miller-El*; (2) additionally, as discussed below, the decision to deny a COA because the Panel believed that the *Beck* Claim would ultimately be unsuccessful also put the *Panel Decision* in direct conflict with *Miller-El*.

In *Miller-El*, the court emphasized that "a COA does not require a showing that the appeal will succeed." *Id.*, at 337. "A court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." *Id.* **The question is the debatability of the underlying constitutional claim, not the resolution of that debate.**" *Id.*, at 342 (emphasis added):

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack*, "where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *529 U.S., at 484.*

*Id.*, at 338.

---

[5](...continued)
test to be "whether the state court decision, evaluated *objectively* and on the merits, resulted in an outcome that cannot reasonably be justified [under existing Supreme Court precedent]") (emphasis added).

[6] See, *Miller-El*, 537 U.S., at 338 ("The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").



The gravity of the Panel's error in failing to understand its limited role under *Miller-El* in passing on an application for a COA cannot be overstated. In all candor, and without intending any disrespect to the integrity or intellectual honesty of the members of the Panel, the Panel's ruling creates the appearance that the Panel has pre-judged the outcome of this case. See, *Liteky v. United States*, 510 U.S. 540, 548 (1994) (issues relating to recusal under 28 U.S.C. §455(a) are to be "evaluated on an **objective** basis, so that what matters is not the reality of bias or prejudice, but its appearance") (emphasis in original). For the above reasons, standing alone, the Panel should vacate the *Panel Decision*, grant the application for COA and recuse itself from further proceedings in this appeal.

**Whether the District Court Was Correct in<br>Rejecting the *Beck* Claim is at Least "Debatable"**

The Panel's confusion concerning its role under *Miller-El* also fatally infected its consideration of the merits of Capano's *Beck* Claim for purposes of issuing a COA. Thus, the Panel simply did not consider, as required by *Miller-El*, whether "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." In his application for a COA, Capano proffered two separate and independent arguments in support of his assertion that the District Court's disposition of the *Beck* Claim was at least "debatable" if not completely wrong: (1) Capano's testimony that Fahey's death was an "accident," and (2) the existence of "gaps" in the State's entirely circumstantial case concerning Capano's "state of mind". Regrettably, the *Panel Decision* does not indicate if those arguments were even considered by the Panel, much less addressed on their merits under the *Miller-El* standard. Those arguments are restated (in abbreviated form) as follows.

**The "Accident" Evidence**

Capano's first argument in the District Court under *Beck* and its progeny was that the jury should have been instructed on lesser included offenses based on Capano's testimony at trial that

Fahey's death was an "accident."[7] In Capano's direct appeal, the argument that the "accident" evidence supported his claim under *Beck* that the trial court should have instructed the jury on lesser included offenses was rejected by the Delaware Supreme Court:

> This [accident] evidence does not support an instruction on a lesser included offense. **This Court has held that an accident defense is incompatible with recklessness or criminal negligence** (footnote omitted)...We are not persuaded by Capano's argument that a jury could find that he acted recklessly or negligently by "grabbing the arm of a hysterical woman threatening suicide and brandishing a gun."

*Capano II*, 781 A.2d at 633 (emphasis added).[8]

In the District Court, Capano argued that the above holding was an unreasonable interpretation of Delaware law, and hence, an unreasonable application of *Beck*.[9] Capano argued that at the time of his trial, it was clearly established under Delaware law that a defendant's claim that a killing was an "accident" was, in reality, a claim that a defendant had a lesser degree of culpability than that required for conviction of the charged offense. See, *Hall v. State*, 431 A.2d 1258, 1260 (Del. 1981) ("the defense of accident, if believed, could negate either or both the culpable state of

---

[7] Capano's "accident" testimony is summarized in the *Habeas Decision*, *13-*14. It is also summarized in *Capano II*, 781 A.2d 585-586.

[8] Under Delaware law, the crime of Murder First Degree is defined as "intentionally caus[ing] the death of another person." 11 *Del.C.* §636(a)(1). There are also three other crimes that constitute lesser included offenses to First Degree Murder: Second Degree Murder, 11 *Del.C.* §635 ("recklessly caus[ing] the death of another person [with] cruel, wicked and depraved indifference to human life"); Manslaughter. 11 *Del.C.* §632(1) ("recklessly caus[ing] the death of another person"); and, Criminally Negligent Homicide, 11 *Del.C.* §631 (causing "with criminal negligence...the death of another person"). The distinction between the degrees of homicide is the requisite "state of mind" of the defendant. See, *Delaware Criminal Code with Commentary*, 15-16 (1973); *Lilly v. State*, 649 A.2d 1055, 1060-62 (Del. 1994).

[9] See, 11 *Del.C.* §206(c); *Henry v. State*, 805 A.2d 860, 865-866 (Del. 2002) ("A defendant is entitled to an instruction on a lesser included offense if there is any evidence fairly tending to bear upon the lesser included offense. 'however weak' that evidence may be...The trial judge may not intrude upon the province of the jury 'which may find credibility in testimony that the judge may consider completely overborne by the simply overwhelming evidence of the prosecutor'"). In the *Habeas Decision*, the District Court noted that the Delaware Supreme Court had concluded that "the language of [§206(c)] is drawn almost verbatim from the United States Supreme Court's *post-Beck* decision in *Hopper v. Evans*, 456 U.S. 605 (1982)." *Id.*, at *26. Capano agrees with the District Court that Delaware law determines the entitlement to instructions on lesser offenses under *Beck*.

mind or the voluntariness of the act").[10] Thus, under *Hall*, it is the state of mind specified in the statutory definition of an offense that determines precisely which "accidents" will constitute a defense. See, Robinson, *Criminal Law Defenses*, §63, pp. 269-271 & n.4 (1984) (citing *Hall* and noting that courts often deal with "accident" in terms of culpability requirements, which render special provisions concerning "accident" unnecessary or redundant). For example, if the required state of mind for the charged offense is "intentional," as in Murder First Degree, then evidence of a "reckless accident," or a "criminally negligent accident," will support a charge on lesser included offenses. See, Robinson, *supra.* at §62(b), p. 248.

Capano also argued that another Delaware case, *Henry v. State*, 805 A.2d 860 (Del. 2002), decided approximately one year after the decision in *Capano II.* showed that *Hall* was not an aberration and reaffirmed that a claim of "accident" will entitle a defendant to instructions on lesser included offenses. In *Henry*, the defendant shot and killed his fiancee, Siobhan Canty ("Canty") in the small bathroom of the house they shared. Three bullets struck Canty's body in the head, chest, and back. The gunshots to the head and chest entered at downward angles, indicating that the shots were discharged at close range. The following day, Henry placed the body into a suitcase and loaded it into the trunk of his car and then dumped the suitcase in an area off of Route 9, south of New Castle. *Id.*, 805 A.2d at 862. At trial, Henry testified that on the day of the killing, Canty had taken a shower and started yelling at him. According to Henry, when he entered the bathroom, Canty was standing with a handgun pointed at him. Henry attempted to wrestle the gun away from her. Henry testified that "[they] got in a screaming match. [He] accidentally shot [himself] in the foot, and [he]

---

[10] In *Hall*, the defendant shot his mother between the eyes, according to expert testimony, from a distance of approximately six inches. Although a witness heard the defendant say "I'll kill you" just before the gun went off, the defendant testified that during a discussion with his mother, the gun, which he had obtained from an upstairs closet, had "accidentally" discharged. *Id.* at 1258-1259. The trial court instructed the jury on the charged offense of Murder First Degree and the lesser included offenses of Murder Second Degree, Manslaughter and Criminally Negligent Homicide. *Id.* at 1258. It also instructed that the defendant's contention "that the shooting was accidental" required the jury to "consider whether the evidence raises a reasonable doubt as to the existence of the state of mind required for the offense in question, that is, whether the defendant acted intentionally, recklessly or with criminal negligence." *Id.*, at 1260.

got extremely upset and just a wave of emotion took over and [he] shot her." Henry testified that he did not intentionally kill Canty. He stated that in pulling the trigger "a total rage of emotions just came over [him], [he] had no control." *Id.*, at 863.

Henry requested the trial judge to instruct the jury on Murder in the Second Degree, as a lesser included offense of Murder in the First Degree. Henry argued that his testimony provided an evidentiary basis for the jury to find that his shooting of Canty was reckless. In refusing to instruct the jury on Murder Second Degree, the trial judge stated "three different parts of the body within a very short period of time. It seems to me that reckless is absurd under those conditions. I'm not going to give it." *Id.* Unlike Capano, however, Henry's conviction for First Degree Murder was reversed on appeal.

Even though *Henry* was not a capital murder case, the Delaware Supreme Court concluded that *Beck* provided a well established foundation to instruct the jury on lesser included offenses:

> The United States Supreme Court has recognized that "providing the jury with the 'third option' of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable-doubt standard." This fundamental principle was developed in recognition that the extension of the full benefit of the concept of reasonable doubt may be compromised if the jury had no alternative but to set free a defendant accused of a particularly heinous crime.

*Id.*, at 864 (internal citations omitted).

Turning to Henry's version of the killing, which, like Capano's accident testimony, was entirely uncorroborated, the court stated:

> Henry asserts that the jury could have held him responsible for the reckless killing of Canty in view of the unknown sequence of the shooting. **He contends the jury could infer from his testimony that he fired the gun wildly in the bathroom.**
>
> * * * *
>
> Despite the trial judge's belief that Henry's contention of recklessness was "absurd," it is well settled that the jury is the sole judge of the credibility of witnesses and is responsible for resolving conflicts in the testimony. In ruling upon a request to instruct the jury on a lesser

included offense, the trial judge "must give full credence to [the] defendant's testimony."

\* \* \* \*

Henry's testimony presented evidence from which the jury could find the elements of the lesser included offense of Murder in the Second Degree...We hold that the trial judge erred in taking the issue of Henry's *mens rea* away from the jury by refusing to instruct on the lesser included offense of Murder in the Second Degree. That error resulted in a violation of Henry's due process rights under the United States Constitution...

*Id.*, at 865-866.

The decision and reasoning in *Capano II* cannot rationally or objectively be harmonized with the reasoning in *Hall* and *Henry*. In *Capano II*, the court took it upon itself to do precisely what it said in *Henry* that the trial court should not have done – take the issue of the defendant's state of mind away from the jury simply because the **court** was "not persuaded" by Capano's testimony. Furthermore, contrary to *Hall* and *Henry*, taking the issue of Capano's "state of mind" away from the jury also ignored "this State's strong policy favoring the submission of factual issues to the jury" in criminal cases. *Hall*, 431 A.2d at 1259; *Plass v. State*, 457 A.2d 362, 368 (Del. 1983) (issue of defendant's state of mind in a homicide case is "peculiarly for the jury" where evidence supports more than one conclusion). Finally, there is yet another aspect of the court's ruling that shows just how far removed *Capano II* lies from the mainstream of Delaware law. While in Capano's own mind, the shooting may have been a "pure accident" which involved no culpability on his part because he did not fire the gun and did not intend to shoot Fahey, the Delaware Supreme Court court refused to recognize that the jury could have viewed Capano's conduct – grabbing the arm of a hysterical woman brandishing a gun and threatening suicide – as being the "cause" of Fahey's death. As in *Hall* and *Henry*, the jury was free to disbelieve some or most of Capano's testimony without rejecting all of it. In other words, the jury could reasonably have concluded that Capano was trying to put the best light on an accident that was in fact reckless conduct by making it seem entirely non-culpable. See, *Henry*, 805 A.2d at 866 ("A defendant is entitled to a lesser included offense

instruction even if it 'depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and [State's] witnesses on the other points in dispute'"). Under *Hall*, and therefore under *Beck*, Capano was entitled to have the jury decide whether his act was the "cause" of Fahey's death and also whether his act amounted to a "reckless accident."

The errors in the District Court's response to the above arguments are summarized herein. Capano submits that these errors are sufficient to carry his burden, under *Miller-El*, to show, at least, that the correctness of the District Court's decision on the "accident" aspect of the *Beck* Claim is "debatable," if not entirely wrong.

At the outset of its discussion of the merits of the issue, the District Court acknowledged that Capano was correct in his contention that *Hall* stood for the proposition that Delaware law allowed for the possibility that a claimed "intentional" shooting might also be a "reckless accident" that would entitle the defendant to have the jury instructed on lesser included offenses. *Habeas Decision*, *29-*30. Having made that significant concession, in order to deny habeas relief, the District Court was thus compelled to somehow distinguish *Hall*, *Henry* and their progeny from *Capano II*:

> The facts of *Hall*, however, are a world removed from those presented here. **In this case, Capano, if his testimony is to be believed, never had possession of the firearm, much less pointed it at Fahey.** Rather, he attempted to prevent a purportedly suicidal woman from shooting herself. While the facts of *Hall* offered a rational basis for jury instructions on lesser included offenses, the facts here simply do not.[11]

> * * * *

> No Delaware precedent called to our attention suggests that Capano, under his rendition of the facts, committed any act which runs afoul of the State's homicide statutes. **The cases referenced by Capano all involve situations where the defendant actively possessed a firearm and pointed it toward the victim.** (citations omitted). That was not the situation here. Accordingly, it was not objectively unreasonable for the Delaware Supreme Court to decide that Capano's alleged attempt to disarm a woman threatening suicide provided no

---

[11] *Habeas Decision*, *29.

rational basis for a jury instruction on second degree murder, manslaughter, or criminally negligent homicide.[12]

Whether the distinction drawn by the District Court between this case and all of the other Delaware "accident" cases is legally sufficient to justify the refusal to instruct on lesser offenses under *Beck* is at least "debatable" if not wrong. First, the Delaware Supreme Court in *Capano II* did not attempt to distinguish *Hall* and its progeny from this case on the ground that those defendants were entitled to instructions on lesser offenses because, unlike Capano, they all admitted to firing a weapon. Rather, the Delaware Supreme Court wrongly refused to read *Hall* as even allowing for the possibility of a "reckless accident," no matter who may have actually pulled the trigger. According to the Delaware Supreme Court, *Hall* was inapplicable because "an accident defense is incompatible with recklessness or criminal negligence." *Id.*, 781 A.2d at 633; *id*, n255 (citing *Hall* as holding that defendant's accident defense was the "antithesis of the acts and states of mind which characterize the various degrees of homicide"). In other words, the Delaware Supreme Court would have held that *Hall* was inapplicable even if Capano had admitted to firing the weapon.

Second, the District Court's conclusion that Capano's "accident" testimony did not involve any act on his part that "[ran] afoul of the State's homicide statutes"[13] is also at least "debatable," if not wrong. Remember, the Delaware homicide statutes impose liability whenever the defendant "caus[es] the death of another person." Furthermore, under 11 *Del.C.* §261, "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." Whether Capano's act of trying to disarm MacIntyre by grabbing her arm (which was holding the gun) and trying to push it down was the "cause" of Fahey's death was for the jury to decide. See, *Culver v. Bennett, supra*, 588 A.2d at 1098 ( issues of causation are left for the jury to determine).

---

[12] *Habeas Decision*, *31.

[13] *Habeas Decision*, *31.

-11-

**The Existence of "Gaps" Under *Beck* in the State's Case for Intentional Murder**

In addition to the "accident" argument under *Beck* discussed above, Capano also contended that, even if he had not testified that Fahey's death was an "accident," he would nevertheless have been entitled to have the jury instructed on lesser included offenses under *Beck* and its progeny based on "gaps" in the State's case concerning evidence of his state of mind. Capano argued that this aspect of *Beck* was explained by the Supreme Court in *Schad v. Arizona*, 501 U.S. 624, 646-647 (1991):

> Our fundamental concern in in *Beck* was that a jury convinced that the defendant had committed **some** violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.
>
> * * * *
>
> [In *Beck*], we repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented (citations omitted). As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 82 L. Ed. 2d 340, 104 S. Ct. 3154 (1984), "the absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."

The concern in *Beck* and *Schad* that the reasonable doubt standard will not be observed when the jury is forced into an all-or-nothing choice was embraced by the Delaware Supreme Court in *Chao v. State*, 604 A.2d 1351, 1359 (Del. 1992):

> By according defendants the **procedural safeguard** of providing jurors with the additional option of convicting a person of a lesser included offense, the defendant is more likely to receive the full benefit of the reasonable doubt standard. *Beck*, 447 U.S. at 634. In other words, by limiting a jury's choice of convicting or acquitting a defendant of the charged offense alone, jurors who have determined that a serious crime was committed may convict a person simply because they believe he or she deserves to be punished, although not necessarily for the crime with which the defendant was charged. **The third option of convicting on a lesser included offense reduces the risk of unwarranted convictions [for capital murder].**

This was an extraordinary case to be tried as a capital murder. There was evidence of a killing, the first element of a first degree murder, but no evidence that established the killer's state of mind:

> Although there is evidence of the disposal of Fahey's body, the parties concede that apart from the accident defense offered in Capano's testimony, there is no evidence concerning the *manner* of Fahey's death. Her body was not recovered and neither was any murder weapon. Putting aside Capano's accident defense, no one gave eyewitness testimony bearing on the circumstances under which Fahey died.

*Capano II*, 781 A.2d at 631 (emphasis in original).[14]

Without the benefit of any evidence concerning the manner or circumstances of Fahey's death, and without the benefit of any evidence concerning his state of mind at the time of the homicide, Capano argued that he was entitled to the benefit of the "procedural safeguard" in *Schad/Chao* to allow the jury to consider lesser offenses to First Degree Murder. See, *Capano II*, 781 A.2d at 633 n.256. Although the Delaware Supreme Court never explained why Capano was not entitled to *Schad's* "procedural safeguard," the court held that the "gaps" in the State case did not entitle Capano to instructions on lesser offenses:

> The possibility that Capano killed Fahey by an act that was reckless, criminally negligent, or under the influence of extreme emotional disturbance is based entirely on speculation....If the State's planning evidence and Capano's accident defense are rejected, it is possible that Capano killed Fahey in some kind of jealous rage, or some other reckless or negligent act. But these possibilities are only speculative. They are not supported by any rational basis in the evidence.

*Id.*, at 631.

In the District Court, Capano's arguments based on *Schad Chao* met the same fate:

> Simply put, the only option other than conviction of first degree murder available to the jury on the record before it was to find that the

---

[14] It is the defendant's state of mind that is the critical element which distinguishes murder first degree from its lesser included offenses. *Duonnolo v. State*, 397 A.2d 126, 130 (Del. 1978). In order to convict Capano for First Degree Murder, the State was required to prove not only that a killing occurred, but also had to prove that the killing was "intentional." See, *State v. Moyer*, 387 A.2d 194, 195 (Del. 1987).

State had not proven first degree murder beyond a reasonable doubt, either because the State's evidence in and of itself was insufficient or because the jury believed that Fahey had died at the hand of MacIntyre with no culpability on the part of Capano. **Consequently, the jury could only rationally have found Capano guilty of first degree murder or have acquitted him.**

*Habeas Decision,* *27-*28 (emphasis added).

The District Court's holding is at least "debatable" under *Miller-El* because it completely disregards the rational of *Schad/Chao*. The concern expressed in *Schad/Chao* is that when jurors are given an "all or nothing" choice in a capital case, there is a substantial risk that the jury will not give effect to the reasonable doubt standard and will not vote for acquittal in a case where they believe that the defendant "had committed **some** violent crime, but [are] not convinced that he was guilty of a capital crime." *Schad,* 501 U.S. at 646-647. In other words, the courts in *Schad* and *Chao* recognized the reality that jurors who are presented with an all-or-nothing choice cannot be trusted to act rationally and vote to acquit just because they have a "reasonable doubt" that the defendant is guilty of a capital offense, if they also believe, in the words of *Schad,* that the defendant "had committed **some** violent crime. Indisputably, something happened inside Capano's house that resulted in Fahey's death. Most importantly, in the trial itself, the jury heard Capano confirm by his own testimony the essential details of his brother Gerry Capano's chilling account of the disposal of Fahey's body in the Atlantic Ocean. See, *Capano II,* 781 A.2d at 585-586. The concern expressed in *Schad* – that forcing the jury into an all-or-nothing choice distorts the fact finding process and increases the risk that the defendant will be found guilty – was realized in this case. Based solely on Capano's confirmation of Gerry's account of the disposal of Fahey's body, the very real probability exists that the jury voted to convict Capano of intentional murder, even though they may have harbored a reasonable doubt that the killing was "intentional," because the only other alternative was to set him free. After hearing Capano confirm Gerry's account of the disposal of Fahey's body, it is simply too much to expect, as the court in *Schad* recognized, that the jury would vote to acquit just because they had a reasonable doubt that the killing was intentional. The conclusion in the

*Habeas Decision*, quoted above. that "the jury could only **rationally** have found Capano guilty of first degree murder or have acquitted him" is "debatable," if not wrong, under *Schad/Chao* for precisely the reason that the District Court failed to consider the likelihood, as the court recognized in *Schad*, that unless the jury was provided with the "procedural safeguard" of a "third option," that the jury could not be trusted to act "rationally" in reaching its verdict.

### The Petition for Rehearing *En Banc*
### Statement of Counsel Under LAR 35.1

For the reasons discussed in the Petition for Panel Rehearing herein, I express a belief, based on a reasoned and studied professional judgment, that the *Panel Decision*, as it pertains to the standard for granting a COA, is contrary to the decision of the Supreme Court of the United States in *Miller-El v. Cockrell*, 537 U.S. 322, 335-336 (2003) and the decisions of the United States Court of Appeals for the Third Circuit in *Perry v. Diguglielmo*, 169 Fed. Appx. 134, 136 (3d Cir. 2006); *DeVaughn v. Dodrill*, 145 Fed. Appx. 392, 394 (3d Cir. 2005), and *Morgan v. Lamanna*, 150 Fed. Appx. 145, 147-148 (3d Cir. 2005), and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court.

*Joseph M Bernt*

JOSEPH M. BERNSTEIN (#780)
800 N. King Street - Suite 303
Wilmington, DE 19801
302-656-9850
302-656-9836 (Fax)
E-mail: jmbernstein @ embarqmail.com
Attorney for Appellant

Dated: August 8, 2008

BLD-248                                                    July 10, 2008
UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
C.A. No. **08-2282**

THOMAS J. CAPANO

    VS.

WARDEN PERRY PHELPS, ET AL.

    (D. DEL. CIV. NO. 06-CV-00058)

Present: MCKEE, RENDELL and SMITH, <u>Circuit</u> <u>Judges</u>

    Submitted are:

    (1)    Appellant's request for a certificate of appealability under 28
           U.S.C.§ 2253(c)(1); and
    (2)    Appellant's motion for enlargement of page limitation
           in the above-captioned case.

           Respectfully,

           Clerk

MMW/KGL/crg

_____ORDER_____

Capano's motion to waive the page limitations for filing an application for a certificate of appealability is granted. His request for a certificate of appealability is denied. For the reasons stated by the District Court, Capano has not made a substantial showing of the denial of a constitutional right as a result of the Delaware state court's decision not to instruct the jury on lesser-included offenses to first degree murder. See <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003). The decision that lesser-included offense instructions were not required because they lacked an evidentiary basis in the record was not contrary to, or an unreasonable application of, the Supreme Court's precedent in <u>Beck v. Alabama</u>, 447 U.S. 625 (1980), and its progeny.

           By the Court,

           /s/ D. Brooks Smith
           Circuit Judge

Dated:    July 29, 2008
tyw/crg/cc: Joseph M. Bernstein, Esq.
           Elizabeth R. McFarlan, Esq.

Exhibit 1

1 of 14 DOCUMENTS

## THOMAS J. CAPANO v. THOMAS L. CARROLL, et al.

### CIVIL ACTION NO. 06-58

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

### *2008 U.S. Dist. LEXIS 32648*

**April 15, 2008, Decided**
**April 15, 2008, Filed**

**COUNSEL:** [*1] For Thomas J. Capano, Petitioner: Joseph M. Bernstein, LEAD ATTORNEY, Joseph M. Bernstein, Esq., Wilmington, DE.

For Warden Thomas J. Carroll, Attorney General of State of Delaware, Respondents: Elizabeth Roberts McFarlan, Department of Justice, Wilmington, DE.

**JUDGES:** HARVEY BARTLE III, C.J. SITTING BY DESIGNATION.

**OPINION BY:** HARVEY BARTLE III

**OPINION**

*MEMORANDUM*

Bartle, C.J.

Before the court is the petition of Thomas J. Capano for habeas corpus relief under *28 U.S.C. § 2254*. He alleges that he is in state custody in violation of the Constitution of the United States.

Capano, a prominent Delaware lawyer, was convicted in the Superior Court in and for New Castle County of murder in the first degree of Anne Marie Fahey, the scheduling secretary of the State's then-Governor, Thomas R. Carper. Judge William Swain Lee sentenced Capano to death upon recommendation of the jury. *State v. Capano, Cr.A. No. 97-11-0720, 1999 Del. Super. LEXIS 541 (Del. Super. Ct. Mar. 16, 1999)*. The Supreme Court of Delaware affirmed on direct appeal, and the United States Supreme Court denied Capano's petition for a writ of certiorari. *Capano v. State, 781 A.2d 556 (Del. 2001), cert. denied, Capano v. Delaware, 536 U.S. 958, 122 S. Ct. 2660, 153 L. Ed. 2d 835 (2002)*. In a subsequent [*2] post-conviction proceeding, the state Supreme Court overturned his death sentence and remanded for a new penalty trial. *Capano v. State, 889 A.2d 968 (Del. 2006)*. When the State elected not to proceed with that second trial, Capano was resentenced to life in prison without the possibility of parole.

I.

Anne Marie Fahey, age 30, was last seen in public on Thursday evening, June 27, 1996, while dining at a Philadelphia restaurant with Capano, age 46, who was then separated from his wife Kay. Capano was the managing partner of the Wilmington office of a large Philadelphia-based law firm and a frequent participant in the civic and political life of Wilmington and the State of Delaware. Previously he had served as a state prosecutor, City Solicitor for the City of Wilmington, and Legal Counsel to former Governor Michael N.

Case: 08-2282    Document: 00312011580    Page: 19    Date Filed: 08/12/2008

Page 2
2008 U.S. Dist. LEXIS 32648, *

Castle.

Fahey's absence from her office on Friday, June 28 did not cause concern because she was not scheduled to work that day. It was not until she failed to appear at a family function on Saturday evening, June 29 that her relatives contacted Wilmington police to report her missing. Almost immediately, the police directed their attention toward Capano. Around 3 a.m. on [*3] Sunday, June 30, they visited Capano at his home on Grant Avenue in Wilmington. [1] He stated in response to their inquiries that he had not seen or heard from Fahey since dropping her off at her Wilmington apartment after an uneventful evening on the previous Thursday, June 27. The police returned on Sunday afternoon, and Capano permitted them a "walkthrough" of his home. They saw nothing suspicious. However, they continued to focus on Capano as a suspect when they learned he had been involved in a discreet, on-again-off-again affair with Fahey since late 1994. By mid-July, 1996, the Federal Bureau of Investigation ("FBI") had begun to assist the State and local authorities. Despite intensive efforts, the investigation proceeded slowly for over a year without the discovery of Fahey, her body, or any murder weapon.

    1   After Capano and his wife separated in September, 1995, he moved out of the family's Wilmington home where his wife and four daughters lived and into a house on Grant Avenue.

The turning point came in October, 1997 when federal agents raided the Wilmington home of Capano's brother Gerry and found illegal drugs and guns. The next month, Gerry, facing federal charges, became    [*4] a cooperating witness. He told authorities that he had helped Capano dispose of a body in the Atlantic Ocean on Friday, June 28, 1996 and provided them with other incriminating evidence. In November, 1997, Louis Capano, another brother, began his cooperation with the prosecution as part of a plea agreement. In February, 1998, Deborah MacIntyre, a long-time paramour of Capano, similarly signed a plea agreement and disclosed to the State significant helpful information. [2]

    2   Gerry, Louis, and MacIntyre each admitted to having initially lied to the Grand Jury and to the authorities.

Capano was arrested on November 12, 1997 and was indicted by the State of Delaware on a single charge of first-degree murder. In October, 1998, Capano went to trial before Judge Lee and a jury in the New Castle County Superior Court. The trial lasted three and a half months. The State presented a case grounded largely upon circumstantial evidence without the body of Fahey or the murder weapon ever having been found. The prosecutors presented evidence that Capano, as a rejected lover, had a clear motive to kill Fahey, that he had formulated a plan to do so, and that his actions on June 27, 1996 and thereafter reflected [*5] a consciousness of guilt.

The evidence at trial revealed that Fahey had begun dating Capano in March, 1994 and that it soon turned into an intimate relationship. Capano, who came from an affluent family and was sixteen years older than Fahey, constantly showered her with expensive gifts. Fahey had had a traumatic childhood and lived from paycheck to paycheck. For several years she had also been suffering from an eating disorder.

Fahey kept the nature of this relationship secret from all but her closest friends, largely because she felt enormous guilt as Capano was married with four daughters. In late 1995, Fahey started dating Michael Scanlan, a young accountant. She began to fall in love with Scanlan and became more and more concerned that he would discover her relationship with Capano. Fahey worried that Capano would disclose her eating disorder to her new boyfriend.

In early 1996, Fahey tried to break off her relationship with Capano even as he continued

to pronounce his love for her. Several of Fahey's closest friends testified that between February and April, Fahey frequently complained about his controlling, obsessive nature and his overbearing behavior. Also during this period, [*6] Fahey revealed her troubled and strained relationship with Capano to her psychiatrist and to her two psychologists who had been professionally treating her. On April 7, 1996, Fahey wrote in her diary that, "I have finally brought closure to Tom Capano ... what a controlling, manipulative, insecure jealous maniac." By mid-to-late April, Fahey had ended their romantic relationship. From that point on, although she and Capano continued to see each other, she considered him at most to be a friend.

The State introduced circumstantial evidence to prove that by early 1996 Capano had begun to plot Fahey's death. Two of his brothers, Gerry and Joe, testified that in February, 1996, he told them a story about being threatened by one or more unidentified extortionists. Gerry related that in connection with the supposed extortion, he loaned Capano $ 8,000 and a handgun, both of which Capano returned to him by May, 1996. Significantly, Gerry testified that at some time between February and May, 1996, Capano asked if he could borrow Gerry's boat if he needed to dispose of a body.

The State established that on April 20, 1996, shortly after Fahey had made clear to Capano that she no longer wanted a romantic [*7] relationship, he purchased a large marine cooler even though he did not own a boat or have any knowledge of or interest in fishing. Deborah MacIntyre, Capano's mistress of seventeen years, provided further crucial evidence. She testified that on May 13, 1996, he drove her to Miller's Gun Center in Wilmington where at his request she purchased for him a handgun and ammunition while he waited in the car outside. She said she returned to the car, gave him the purchases, and never saw the gun or ammunition again.

After presenting its case as to both motive and premeditation, the State introduced evidence that on Thursday, June 27, 1996 and afterward, Capano behaved in a manner consistent with a consciousness of guilt. On that Thursday, the day of her disappearance, Fahey left work in the Governor's Office at about 4:30 p.m. and met with her psychiatrist, Dr. Neil Kaye. Sometime thereafter, she and Capano traveled to a restaurant in Philadelphia for dinner. Their server at the restaurant, who was called as a witness, stated that they "didn't speak to each other at all" and that Fahey looked "haggard and gaunt" and had a "somber" demeanor.

Capano did not appear at his law office on Friday, [*8] June 28 and had cancelled a golf game he had planned with a friend for that day. According to Gerry, early that Friday morning between 5:30 and 5:45 a.m., Capano, without prearrangement, drove his Jeep Cherokee into the driveway of Gerry's house in Wilmington. Capano requested to borrow Gerry's boat. Gerry immediately assumed Capano needed to do so because he had killed his supposed extortionist. Gerry asked him, "Did you do it?" Capano nodded affirmatively. Gerry then agreed that Capano could use the boat but only if Gerry accompanied him since Capano had no nautical expertise. Capano reluctantly agreed. Because Gerry first had some business matters to take care of, the two planned to meet at Capano's home in Wilmington later that morning.

By the time Gerry arrived at Capano's home at about 8:30 a.m., Capano had exchanged his Jeep Cherokee for his estranged wife's Suburban, which was larger than the Jeep Cherokee. Gerry entered Capano's garage where he saw a large marine cooler covered by a chain and lock. Although Gerry did not look inside the cooler, he instructed Capano to remove the chain and lock to lessen the likelihood of suspicion in the event that they were stopped by the [*9] police. The two then placed the cooler into the back of the Suburban.

Case: 08-2282    Document: 00312011580    Page: 21    Date Filed: 08/12/2008

Page 4
2008 U.S. Dist. LEXIS 32648, *

Capano, accompanied by Gerry, drove the Suburban at a high rate of speed to Gerry's beach house in Stone Harbor, New Jersey. There, the two transferred the cooler to Gerry's boat, locked it again using the lock and chain, and took the boat with its cargo to a nearby marina where Capano paid a large sum in cash to fill the boat's gas tank. Gerry then piloted the boat some 60 miles off shore to a location where the ocean was almost 200 feet deep. At that point, Capano pushed the cooler with its contents overboard, and when the cooler would not sink, Gerry shot a hole in it with a shotgun he kept on his boat to kill sharks. After the cooler continued to float, Capano pulled it back onboard. Gerry placed the boat's two anchors next to Capano and then moved away toward the other end of the boat. However, he turned around in time to observe an ankle and foot descending into the water. He also noticed that the anchors, the lock, and the chains were gone. After the brothers rinsed out the empty cooler, Gerry unscrewed its lid and tossed both parts back into the ocean. Their mission completed, the two returned to Stone Harbor [*10] before driving back that afternoon to Capano's house in Wilmington.

Once back in Wilmington, Gerry helped Capano carry a bloodstained love seat from the "great room" of Capano's house to the garage. Unable to dismantle the love seat or to cut out the stained portions, they took it in the Suburban to a nearby site where a family business owned in part by their brother Louis was engaged in construction. They dropped the love seat into a large dumpster where Gerry covered it with construction debris. Gerry then headed home.

The State corroborated in crucial respects Gerry's account of the events of Friday, June 28. On July 4, a Delaware fisherman happened to find and retrieve from the ocean a large, lidless marine cooler with bullet holes in it. He turned it over to the authorities in November, 1997 after a fishing friend brought to his attention a story about the Capano case in the newspaper. An employee at the marina in Stone Harbor recalled that she had sold a large quantity of gasoline to two men in a boat on the morning of June 28. The marina records, supporting her story, showed a sizeable cash purchase at about the time identified by Gerry. The Suburban belonging to Capano's wife [*11] was also seen in Stone Harbor that day. Significantly, Gerry waived the attorney-client privilege and allowed his attorney, Edmund D. Lyons, Esq., to testify. Lyons produced his notes showing that Gerry had told him substantially the same story long before the federal agents had raided Gerry's home and subjected him to the possibility of prosecution.

The State put before the jury an analysis showing that fibers from the rug in Capano's great room on the evening of June 27 were found in the Suburban. It produced a receipt dated Saturday, June 29 confirming that Capano had purchased a new rug that day. His housekeeper testified that she noticed the presence of a new rug and the absence of the love seat when she next cleaned after June 27.

The State called Capano's brother Louis as a witness. On Sunday, June 30, Capano told Louis that Fahey had slit her wrists at his home, and as a result his love seat was stained with her blood. Capano reassured him that she was okay and would be back to work on Monday. Capano asked Louis to make sure that the dumpsters at the construction site were emptied right away because Capano had disposed of the love seat and some of Fahey's personal belongings [*12] into one of them. On Monday, July 1, Louis ordered the dumpsters emptied even though they were not full.

On July 31, 1996, federal investigators, executing a search warrant for Capano's home on Grant Avenue, discovered two small spots of blood on a wall in the great room. The efforts of the authorities at DNA matching were initially stymied by the absence of a sample of Fahey's blood. It turned out that Fahey had recently donated blood to the Red Cross. It was retrieved from Europe where it

had been sent and was then compared to the blood found in Capano's home. DNA testing revealed that the odds of the small blood spots belonging to anyone other than Fahey were 1 in 11,000.

The jury also had before it evidence of Capano's behavior in prison after his arrest in November, 1997 and before his trial. He had repeatedly written letters to MacIntyre pleading with her to deny the gun purchase on his behalf. When she refused, he conspired with another inmate to have her house ransacked and burglarized. He went so far as to provide the entry code for her security system, the location of her valuables, and instructions to destroy particular fixtures and works of art.

Capano took the stand in his [*13] own defense at the conclusion of the State's case-in-chief. He denied that he killed Fahey and put the blame on MacIntyre. He testified that MacIntyre had accidentally shot and killed Fahey in the great room of his home on Thursday evening, June 27. According to Capano, after he and Fahey had dinner at a Philadelphia restaurant, they drove back to Wilmington where she stopped briefly at her apartment. They then proceeded to his home and watched television while sitting on the love seat in the great room. Fahey had taken off her pantyhose due to the heat. At some point he retrieved a phone message from MacIntyre, who wanted to come over to his home. Capano said that he called her back and told her not to do so. Nonetheless, using a key Capano had given her, she entered his house around 11:05 p.m. in a jealous rage. Capano stood up to confront her as Fahey began putting on her pantyhose and shoes. MacIntyre threatened to commit suicide, exclaiming, "I might as well kill myself. You deserted me." Capano related that he then observed her begin to lift her arm and realized she had a gun in her hand. He grabbed her arm and pushed it down. The gun MacIntyre was holding thereupon discharged [*14] a single time. Capano testified that Fahey, who was still sitting on the love seat in

the act of putting on her shoes, was struck by the bullet directly above her right ear. He insisted MacIntyre's killing of Fahey was an accident.

Capano took possession of the gun from MacIntyre, who told him she had thought it was unloaded. He then pulled Fahey to the floor, tried to perform CPR for at least twenty minutes to no avail, and used a flashlight to determine whether Fahey's eyes would dilate. Capano noted that he took these emergency measures despite knowing almost immediately that Fahey was dead. He therefore decided not to call 911. Around 11:30 p.m., he escorted MacIntyre to her car where he observed the gun's magazine. He took the magazine and sent her on her way home. He admitted that at this point he began planning a cover-up.

Capano recounted that after MacIntyre left he carried the marine cooler from his garage into the great room. By 11:45 p.m. that night he had stuffed Fahey's body inside the cooler. Thereafter, he drove at a high rate of speed to Fahey's nearby apartment and dropped off groceries and a gift he had given her that night. In an attempt to establish a false alibi [*15] for himself, Capano, upon returning home, called his law firm's answering machine service at 12:05 a.m., on Friday, June 28. According to his account, MacIntyre came back to his Grant Avenue house no later than 1:00 a.m. She helped him roll up the blood-stained carpet in the great room and move the cooler containing Fahey's body into the garage. Capano later hid the gun and magazine in the cooler with Fahey's body.

MacIntyre's testimony contradicted that of Capano. She explained she had spoken to Capano on the phone late on Thursday night, June 27, describing him as sounding agitated. She denied she was at Capano's house at any time that evening or had any knowledge of or involvement in Fahey's death or the ensuing cover-up. The State presented witnesses who corroborated that MacIntyre arrived at work at a local private school the next morning, Friday,

June 28 by 6:45 a.m. and that she seemed completely composed and normal in demeanor.

Capano admitted the accuracy of much of what Gerry recounted. He acknowledged that he had enlisted Gerry's help on Friday morning, June 28, that he and Gerry had driven the cooler containing Fahey's body to Gerry's house in Stone Harbor and that he had [*16] then used Gerry's boat to dispose of Fahey's body and the cooler at sea. He confirmed Gerry's testimony concerning the disposal of the love seat while adding information unknown to Gerry. Capano described how later in the day on Friday, June 28, when he was alone, he had discarded into a dumpster in New Jersey the blood-stained rug and the rags he had used to wipe up Fahey's blood.

On the other hand, Capano denied that Gerry had asked him on Friday morning, June 28 if he had "do[ne] it" or that he had nodded in the affirmative. He stated that he had never mentioned an extortion plot to Gerry or Joe and had never asked Gerry prior to June 28 if he could borrow the boat. As to the $ 8,000 he had borrowed from and later repaid to Gerry, it was to help Fahey pay for inpatient treatment for her eating disorder, but she refused the money. The defense presented an expert, Dr. Carol Tavani, who opined that Gerry's testimony was a classic case of "confabulation," in which a heavy drug user such as Gerry unwittingly fills gaps in memory with false memories. Not surprisingly, the defense made much of the fact that Gerry as well as Louis and MacIntyre had originally told the authorities and the [*17] Grand Jury stories unhelpful to the State and had later worked out favorable plea agreements in return for their cooperation.

To rebut the State's evidence of motive, Capano testified that he and Fahey had maintained a sexual relationship as late as June 22, 1996. He also attempted to explain away the State's evidence of planning. He said that he had bought the marine cooler in April, 1996, not as a repository for Fahey's body, but as a gift for Gerry for use on his boat. He had

delayed giving the cooler to Gerry with the idea of presenting it to him over the July 4th holiday at the New Jersey shore. He asserted that MacIntyre bought the gun not for him but rather for her own protection and against his advice. Finally, as set forth above, he described how MacIntyre had accidentally killed Fahey. He volunteered on direct examination that he had kept silent, not telling anyone for over two years, about the circumstances surrounding Fahey's death because of his overriding desire to protect MacIntyre, with whom he was "deeply in love."

The jury, believing the State's version of events and not Capano's, found him guilty of murder in the first degree. Capano now contends that he is entitled [*18] to relief on the basis of several alleged violations of his federal constitutional rights.

II.

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which placed restrictions on the power of federal courts to grant habeas corpus relief to state prisoners such as Capano. *See 28 U.S.C. § 2254*. The law took effect on April 24, 1996 and governs all petitions filed thereafter. *Werts v. Vaughn, 228 F.3d 178, 195 (3d Cir. 2001); 28 U.S.C. § 2254(d)*. Capano filed his habeas corpus petition in this court on January 30, 2006.

Under *§ 2254(a)* a federal court may entertain habeas corpus applications from those persons in "custody pursuant to the judgment of a State court and to grant relief only on the ground that they are in custody in violation of the Constitution or laws or treaties of the United States." *28 U.S.C. § 2254(a); Werts, 228 F.3d at 195-96*. Before relief can be granted, however, a state prisoner must have exhausted available state remedies. *See 28 U.S.C. §§ 2254(b)(1)(A), (c)*. Exhaustion requires a petitioner first to present fairly all federal claims through one complete round of the state appellate review process. *O'Sullivan v.*

Case: 08-2282  Document: 00312011580  Page: 24  Date Filed: 08/12/2008

Page 7
2008 U.S. Dist. LEXIS 32648, *

*Boerckel, 526 U.S. 838, 845, 847, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999)*; [*19] *Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002)*. To present a claim fairly, a petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice" of the federal claim that is being asserted. *McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999)* (citing *Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982))*.

In addition, a federal court cannot grant habeas corpus relief if the judgment of a state court denying relief on a claim rests on a ground that is independent of the merits of the federal claim and adequate to support that judgment. *Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991)*. A state procedural rule is "adequate" to support a state court judgment only if it was "firmly established and regularly followed" by the state courts at the time it was applied. *Ford v. Georgia, 498 U.S. 411, 424, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991)*.

Even if a claim is adjudicated on the merits in a state court proceeding, federal habeas relief is barred unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision [*20] that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court ruling is "contrary to" clearly established Supreme Court precedent for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law" as delineated by the Supreme Court, or "if the state court confronts a set of facts that are materially indistinguishable from" a Supreme Court decision and arrives at a different result. *Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)*; see *Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 1995)*. A state court ruling constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court cases but "unreasonably applies it to the facts of the particular state prisoner's case." *Williams, 529 U.S. at 407*. When making the "unreasonable application" inquiry, we must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Id. at 409*. Our Court of Appeals has stated that federal courts may "consider[] the decisions of the inferior federal courts when [*21] evaluating whether the state court's application of the law was reasonable." *Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 890 (3d Cir. 1999)*.

The Supreme Court recently clarified the test we must apply before granting relief where we find constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)*.

*Fry v. Pliler, 127 S. Ct. 2321, 2328, 168 L. Ed.*

2d 16 (2007). Thus, even if we conclude that constitutional error occurred in the state court, we may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht, 507 U.S. at 631.*

III.

The Superior Court judge charged the jury solely with respect to the crime of first degree murder, defined as "intentionally caus[ing] the death of another person." *Del. Code Ann. tit. 11, § 636(a)(1).* [3] Under Delaware [*22] law, a person acts intentionally when "it is the person's conscious object to engage in conduct of that nature or to cause that result ...." *Id. § 231(a)(1).* The jury therefore had the choice of convicting Capano on this charge or acquitting him.

> 3    We note that this definition is over-inclusive. An intentional killing committed where "the person acts under the influence of extreme emotional disturbance" is classified as manslaughter under Delaware law. *Del. Code Ann. tit. 11, § 632(3).* Moreover, "[m]any who intend to, and do, kill are not criminally liable at all-those who act in self-defense or with other justification or excuse." *Lawrie v. State, 643 A.2d 1336, 1347 (Del. 1994).*

Capano's first claim for habeas corpus relief asserts that the trial court violated his rights under the *Fourteenth Amendment to the Constitution,* as established in *Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980),* when it refused his request to instruct the jury on lesser included offenses to the indicted charge of first degree murder. Because the claim was properly presented to and considered on the merits in the trial court and in the Delaware Supreme Court, Capano has satisfied the exhaustion requirement. *O'Sullivan, 526 U.S. at 845, 847.*

In [*23] *Beck,* the United States Supreme Court held that in a capital case, the *Eighth Amendment to the Constitution* as incorporated into the *Due Process Clause of the Fourteenth Amendment* requires that a jury be given the option of considering lesser included non-capital offenses when the evidence would have supported such verdicts. [4] *447 U.S. at 634-38; Hopper v. Evans, 456 U.S. 605, 611-12, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982).* As the Supreme Court explained in *Schad v. Arizona, 501 U.S. 624, 646, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991),* "Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." Forcing the jury to make the all-or-nothing choice introduces "a level of uncertainty and unreliability into the factfinding process that cannot be tolerated in a capital case." *Beck, 447 U.S. at 643.*

> 4    The *Eighth Amendment* states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const. amend. VIII.* The *Due Process Clause of the Fourteenth Amendment* mandates that [*24] no State shall "deprive any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV, § 1.*

Capano asked for jury instructions on three crimes that constitute lesser included offenses to the charged count of first degree murder: second degree murder, manslaughter, and criminally negligent homicide. Delaware law defines murder in the second degree as "recklessly caus[ing] the death of another person under circumstances which manifest a cruel, wicked and depraved indifference to human life." *Del. Code Ann. tit. 11, § 635.* Manslaughter means "recklessly caus[ing] the death of another person" or "intentionally caus[ing] the death of another person under

circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance." *Id. § 632(1), (3)*. A person acts "recklessly" "when the person is aware of and consciously disregards a substantial and unjustifiable risk ... [which] will result from the conduct." *Id. § 231(e)*. Finally, criminally negligent homicide consists of causing, "with criminal negligence, ... the death of another person." *Id. § 631*. A person acts with criminal negligence "when the person fails to [*25] perceive a risk that ... will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id. § 231(a)*.

Both the Superior Court and the Delaware Supreme Court ruled that Capano was not entitled to instructions on lesser included offenses. Under Delaware law, the jury must be charged on lesser included offenses in capital cases only if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." *Id. § 206(c)*. The Delaware Supreme Court explained:

> The State argues that no evidence was presented of recklessness or criminal negligence, and that "the jury was not free to infer a state of mind from nonexistent evidence." Our independent review of the evidence at trial confirms the accuracy of the State's view. There is no such evidence. To permit the jury to find the elements of the lesser included offenses on this record would permit unguided speculation by the jury.

*Capano v. State, 781 A.2d 556, 630-31 (Del. 2001)*. That Court was cognizant [*26] of the federal due process issue presented by *Beck*. It observed that the language of the Delaware statute is drawn almost verbatim from the United States Supreme Court's *post-Beck* decision in *Hopper v. Evans, 456 U.S. 605, 102 S. Ct. 2049, 72 L. Ed. 2d 367 (1982)*. *Hopper* held that a lesser included offense instruction should be given "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser offense and acquit him of the greater." *Hopper, 456 U.S. at 612*. Because the Delaware Supreme Court found no rational basis in the evidence to support Capano's desired instructions under Delaware law, it concluded that no such basis existed under the similar federal constitutional standard. *Capano, 781 A.2d at 633-34*.

Capano, as previously noted, was convicted of first degree murder and sentenced to death by the trial judge on the jury's recommendation. After Capano's death sentence was overturned in a post-conviction proceeding, *Capano v. State, 889 A.2d 968 (Del. 2006)*, he was resentenced to life imprisonment without the possibility of parole. He argues that a rational basis for his requested points for charge did exist in the evidence, namely, that the jury could have found his actions to be criminally [*27] reckless or criminally negligent based either on "gaps" in the State's evidence or on his own "accident" account of the events of June 27, 1996. We treat the issue of the sufficiency of the evidence for a lesser included offense instruction as one of law. *See, e.g., Hogan v. Gibson, 197 F.3d 1297, 1306 n.6 (10th Cir. 1999)*.

First, Capano suggests that the jury could have disbelieved certain portions of the State's evidence as to intent, thus leaving gaps as to what actually occurred at Capano's home on the night of June 27, 1996. This is true. Nonetheless, it does not follow that the jury may fill in those gaps with speculation. The record is entirely devoid of any evidence supporting a finding that Capano killed Fahey as a result of recklessness, extreme emotional

disturbance, or criminal negligence. It is undisputed that the prosecution's case was sufficient to establish motive, planning, and consciousness of guilt and to establish an intentional killing by Capano constituting first degree murder. While the jury was free to disbelieve the State's evidence, it was not free to create a scenario with no factual support to convict on a lesser included charge. Simply put, the only option [*28] other than conviction of first degree murder available to the jury on the record before it was to find that the State had not proven first degree murder beyond a reasonable doubt, either because the State's evidence in and of itself was insufficient or because the jury believed that Fahey had died at the hand of MacIntyre with no culpability on the part of Capano. Consequently, the jury could only rationally have found Capano guilty of first degree murder or have acquitted him.

Second, Capano asserts that a jury could have viewed his attempt to prevent MacIntyre from engaging in an apparent suicide attempt as either reckless or criminally negligent behavior on his part. The Delaware Supreme Court described Capano's testimony as being "confined to an accident scenario that involved no crime on his part." Again, Delaware law provides that an act is committed recklessly only if the actor "consciously disregards a substantial and unjustifiable risk ...." An act consists of criminal negligence where a person fails to perceive a risk "of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the [*29] situation."

Capano directs us to *Hall v. State, 431 A.2d 1258 (Del. 1981),* in which the defendant shot his mother between the eyes from a distance of approximately six inches and was charged with first degree murder, second degree murder, manslaughter, and negligent homicide. Despite the defendant's testimony that the gun had accidentally discharged, he was convicted of first degree murder. Capano cites *Hall* for the proposition that there is such a thing as a "reckless accident," that is, an accident that negates the culpable state of mind for one charge but supports a verdict on some lesser charge. We agree. The facts of *Hall,* however, are a world removed from those presented here. In this case, Capano, if his testimony is to be believed, never had possession of the firearm, much less pointed it at Fahey. Rather, he attempted to prevent a purportedly suicidal woman from shooting herself. While the facts of *Hall* offered a rational basis for jury instructions on lesser included offenses, the facts here simply do not.

Capano also cites *Henry v. State, 805 A.2d 860, 865 (Del. 2002),* in which the defendant, charged with first degree murder, killed his wife by shooting her three times at [*30] close range. He argued that he had not intended to kill her and that he was entitled to an instruction on second degree murder because a jury could find that his conduct was reckless under circumstances which manifest a cruel, wicked, and depraved indifference to human life rather than intentional. The trial court rejected that argument, calling the defendant's story "absurd." The Delaware Supreme Court reversed. It held that the jury could have believed the defendant's testimony and returned a verdict of second degree murder. Because Capano's story, even if fully believed, would not have warranted a jury instruction on lesser included charges, *Henry* is inapplicable.

Finally, Capano cites to *Wright v. State, No. 84-2007, 2008 Del. LEXIS 61, at *2 (Del. Feb. 7, 2008).* There, the defendant had engaged in an argument with an acquaintance in a parking lot. Drawing a handgun, the defendant fired between five and ten shots at the man and killed an innocent bystander in the process. *Id. at *2.* Capano cites the case presumably because the defendant was charged with first and second degree murder despite his protests that the shooting was an accident. The Delaware Supreme Court held that because

[*31] the defendant's conduct "could not have fallen below recklessness or criminal negligence," he was not entitled to a jury instruction on accident. *Id. at \*15*. It hardly needs saying that the defendant's conduct in *Wright*, which involved discharging a firearm multiple times in a populated parking lot, bears no similarity to Capano's description of what happened here.

No Delaware precedent called to our attention suggests that Capano, under his rendition of the facts, committed any act which runs afoul of the State's homicide statutes. The cases referenced by Capano all involve situations where the defendant actively possessed a firearm and pointed it toward the victim. *See Wright, 2008 Del. LEXIS 61, at \*2; Henry, 805 A.2d 860, 862-63; Hall, 431 A.2d 1258, 1258-59*. That was not the situation here. Accordingly, it was not objectively unreasonable for the Delaware Supreme Court to decide that Capano's alleged attempt to disarm a woman threatening suicide provided no rational basis for a jury instruction on second degree murder, manslaughter, or criminally negligent homicide. Again, while the jury had the right to disbelieve Capano's story about how Fahey died on the night of June 27, 1996, [*32] it may not substitute a different version or draw inferences that have no support in the record.

The Delaware Supreme Court's *Beck* determination was not an objectively unreasonable application of the law as determined by the United States Supreme Court. Moreover, to the extent that we must decide whether there was an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding, we find that the Delaware Supreme Court did not make an unreasonable determination. *See 28 U.S.C. § 2254(d)(2)*. Consequently, we will deny relief to Capano on the basis of his *Beck* claim. [5]

5  The Supreme Court has not addressed the applicability of *Beck* where a defendant such as Capano has a sentence of death later reduced to life imprisonment. It may very well be that *Beck* does not apply to non-capital cases. *See, e.g., Schad v. Arizona, 501 U.S. 624, 646-47, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991); Bagby v. Sowders, 894 F.2d 792, 796-97 (6th Cir. 1990); Valles v. Lynaugh, 835 F.2d 126, 127 (5th Cir. 1988); Chavez v. Kerby, 848 F.2d 1101, 1103 (10th Cir. 1988); Perry v. Smith, 810 F.2d 1078, 1080 (11th Cir. 1987)*. However, in *Vujosevic v. Rafferty, 844 F.2d 1023, 1027 (3d Cir. 1988)*, which was decided [*33] prior to *Schad*, our Court of Appeals held that *Beck* does apply in non-capital cases. In light of our holding, we need not decide that issue here.

IV.

In his second claim before us, Capano argues that the admission at his trial of certain out-of-court statements made by Fahey violated his right under the *Confrontation Clause of the Sixth Amendment to the Constitution* as incorporated into the *Fourteenth Amendment*. The *Confrontation Clause* states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." *U.S. Const. amend. VI*. Capano raised this argument at trial and presented it to the Delaware Supreme Court on direct appeal. He has thus exhausted his state remedies in this regard. *O'Sullivan, 526 U.S. at 845, 847*.

*Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980)*, sets forth the clearly established law governing the admission of the hearsay statements in light of the *Confrontation Clause*. [6] *See, e.g., McCandless, 172 F.3d at 264-65*. In *Roberts*, the Supreme Court held that the *Confrontation Clause* allows the admission of hearsay against criminal defendants if the evidence falls within a "firmly rooted hearsay exception" or

possesses "particularized [*34] guarantees of trustworthiness." *448 U.S. at 66.* A hearsay exception is "firmly rooted" if "longstanding judicial and legislative experience" has shown that statements admitted pursuant to the exception carry special guarantees of trustworthiness essentially equivalent to those produced by cross-examination. *Idaho v. Wright, 497 U.S. 805, 815, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); see White v. Illinois, 502 U.S. 346, 355 n.8, 112 S. Ct. 736, 116 L. Ed. 2d 848 (1992).* Even if a statement does not fall within a "firmly rooted hearsay exception," it may still satisfy the *Confrontation Clause* if it possesses "particularized guarantees of trustworthiness" such that cross-examination is unnecessary to ascertain the statement's reliability. *Roberts, 448 U.S. at 66 n.9.*

> 6    The Supreme Court partially overruled *Roberts* when it held that the admission of certain "testimonial" hearsay statements violates the *Confrontation Clause. See Crawford v. Washington, 541 U.S. 36, 68-69, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).* It is undisputed that no testimonial statements are at issue here.

Under Delaware law, "[i]n a [*35] prosecution for homicide arising out of a marital or romantic relationship, evidence of previous discord between the victim and the defendant is clearly material to issues of motive and intent." *Gattis v. State, 637 A.2d 808, 818 (Del. 1994).* At trial, the prosecution offered testimony in its case-in-chief from numerous witnesses to whom Fahey had described her relationship with Capano and her feelings concerning it. The State's purpose was to demonstrate that Fahey had ended their intimate relationship over Capano's objection and that he thus had a motive to kill her.

Jill Morrison, Fahey's friend, recounted that Fahey thought that Capano was trying to control her life and that he "was upset ... because she was dating Mike [Scanlan] ...."

Morrison further related Fahey's descriptions of an incident in which Capano climbed Fahey's fire escape and entered her apartment in an attempt to reclaim gifts and another in which he parked his vehicle in his garage, with Fahey in the passenger seat, and locked the car doors as they argued about their relationship. Fahey's friend Siobhan Sullivan said that Fahey called Capano "a possessive, controlling maniac" and later "very adamantly" said, "He's [*36] fucking stalking me." Other friends attested to Fahey's statements expressing a desire to end her relationship with Capano.

The prosecution called as witnesses a psychiatrist, Dr. Neil Kaye, and two psychologists, Dr. Michele Sullivan and Dr. Gary Johnson (collectively, "the psychotherapists"), all of whom had professionally treated Fahey while she was dating Capano. Each of them testified as to statements made by Fahey during the course of diagnosis and treatment. These statements, like those made to her friends, included both general descriptions of Fahey's feelings toward Capano and accounts of particular incidents involving him. For example, Dr. Kaye testified that in June, 1996, "[Fahey] was clear in her mind that she did not want to have a relationship with Mr. Capano. She was still fearful of him, was not convinced that he was ever going to let go ...." Dr. Kaye further noted that "she was genuinely fearful ... that harm would come to her if she broke things off ..." and that "she was trying to find a way to let him down easy ... because she was worried about rage and anger."

Similarly, Dr. Sullivan testified that Fahey sought to end her involvement with Capano because he was "incredibly [*37] controlling and possessive," so much so that Fahey considered him to be "haunting her" with a plethora of emails, phone calls, and unexpected visits. According to Dr. Sullivan, Fahey was concerned that Capano would have her kidnapped.

Dr. Johnson, like Jill Morrison, related

Fahey's account of the incident in which Capano attempted to reclaim gifts from Fahey's apartment. He testified that Fahey was "quite terrified" because a prominent married man whom she was dating "had come to her apartment quite late at night ... bolted the door shut and kept her inside for ... three or four hours during which time he yelled at her, threatened to expose their relationship ...." Dr. Johnson added that Fahey "felt very much controlled by" the man and that Fahey "began to want to pull away from that relationship, [but] that he was unwilling to let her do so."

Significantly, the prosecution introduced a considerable amount of hearsay evidence by stipulation, including Fahey's diary, emails between Fahey and Capano, and the testimony of Fahey's close friend Kim Lynch-Horstmann. Lynch-Horstmann stated that in December, 1995, Capano "would [*38] e-mail [Fahey] at work all the time and they were kind of obsessive e-mails." Fahey told her that Capano would threaten suicide if she tried to end the relationship. Further, Fahey felt she might have to move out of the state to escape Capano's control. Lynch-Horstmann repeated Fahey's account of the incident in which Capano climbed the fire escape:

> [Capano] tried to remove all of the gifts that he had given Annie from her apartment because he didn't want another man watching the TV that he had given her, the clothes --seeing Annie wear the clothes that he had given her, so he removed a lot of those things from her apartment.

Based on what Fahey told her, Lynch-Horstmann recounted that Capano would "attack her insecurities and refer to her as white trash" and tell her "that she should be lucky that he's even going out with her because of who he is and what he could buy and where she came from."

The statements introduced by stipulation from Fahey's emails and diary were similar. For example, in an email message to Capano on February 12, 1996, Fahey wrote: "Tommy, you scared me this weekend, starting with Friday and all the calls you placed. It really freaks me out when you call every half [*39] hour ...." In a diary entry dated February 23, 1996, Fahey expressed a fear that "[Capano] would fly off the handle again" and on April 7 recorded that Capano was "a controlling, insecure, jealous maniac ...."

The trial judge overruled Capano's objections to the non-stipulated admission of Fahey's statements to her friends, family, and psychotherapists. Nevertheless, he repeatedly delivered timely and appropriate limiting instructions as to the purpose for which the evidence in issue could be used, that is, to prove that Fahey was attempting to extricate herself from her relationship with Capano and that he thus had a motive to kill her. The judge stressed that the statements were not introduced to prove the truth of the underlying facts, of Capano's bad character, or of his state of mind.

> 7 After Dr. Kaye's testimony, the trial court instructed the jury that, "Members of the jury, I want to remind you of a warning I gave you earlier in response to an objection that was made by the defense. The purpose of this evidence is to examine the mental state, the emotional state of Anne Marie Fahey ... it in no way reflects as evidence of any actions or any state of mind on behalf of the defendant. [*40] This deals solely with Miss Fahey, not with Mr. Capano."
>
> Prior to Jill Morrison's testimony, the court also instructed the jury, "You may not consider the evidence [of Capano's obsessive behavior] as proof that the defendant is a bad person, and therefore, probably committed the offense with which he is charged."

Case: 08-2282    Document: 00312011580    Page: 31    Date Filed: 08/12/2008

Page 14
2008 U.S. Dist. LEXIS 32648, *

On direct appeal, the Delaware Supreme Court first considered whether Fahey's statements were properly admitted under *Rule 803(3)* of the Delaware Rules of Evidence ("D.R.E."), the "state of mind" exception, which allows the admission of any

> statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed ....

This rule is the same as *Rule 803(3) of the Federal Rules of Evidence.* The Court distinguished Fahey's statements describing her then existing state of mind, such as those indicating she was afraid of Capano, from her statements of fact or memory that gave rise to that state of mind, such as her descriptions of his obsessive behavior. The Court concluded that Fahey's statements **[*41]** in the former category were properly admitted in the State's case-in-chief under D.R.E. 803(3) while those in the latter category were not.

The Delaware Supreme Court then addressed whether the admission of these state of mind statements violated the *Confrontation Clause* under *Roberts.* It concluded that because D.R.E. 803(3) is a firmly rooted hearsay exception, the statements properly admitted pursuant to the Rule did not give rise to any constitutional infringement. The Court determined, however, that the trial court's admission of Fahey's statements of fact or past events was evidentiary error under D.R.E. 803(3) and also violated Capano's *Confrontation Clause* right. Nonetheless, the Court decided their introduction to be harmless error beyond a reasonable doubt under *Chapman v. California, 386 U.S. 18, 87 S. Ct.*

*824, 17 L. Ed. 2d 705 (1967)* since they were largely cumulative of stipulated evidence.

The Delaware Supreme Court went on to rule that all of Fahey's statements to her psychotherapists, including those containing factual assertions, were admissible under D.R.E. 803(4), which is identical to *Rule 803(4) of the Federal Rules of Evidence* and allows the following hearsay evidence:

> [s]tatements made for purposes **[*42]** of medical diagnosis or treatment and describing medical history, or past or present symptoms or sensations, or the inception or general character of the cause or external causes thereof insofar as reasonably pertinent to diagnosis or treatment.

The Court further reasoned that the statements had sufficient "particularized guarantees of trustworthiness" to satisfy the second *Roberts* prong. [8]

> 8    The Delaware Supreme Court declined to reach the issue of whether, for *Confrontation Clause* purposes, *Rule 803(4)* was a "firmly rooted hearsay exception" with respect to statements made to psychotherapists.

Capano does not contest that *Rule 803(3)* is a firmly rooted hearsay exception under *Roberts.* [9] Instead, he argues that it was constitutional error to allow the admission of Fahey's statements of past events under D.R.E. 803(3). The Delaware Supreme Court agreed but concluded that the error was harmless. We must now review the error to determine if it "had substantial and injurious effect or influence in determining the jury's verdict." *See Fry, 127 S. Ct. at 2328; Brecht, 507 U.S. at 631.* In doing so, there must be more than "mere speculation that the defendant was prejudiced by trial error; the **[*43]** court must

Case: 08-2282    Document: 00312011580    Page: 32    Date Filed: 08/12/2008

Page 15
2008 U.S. Dist. LEXIS 32648, *

find that the defendant was actually prejudiced by the error." *Calderon v. Coleman, 525 U.S. 141, 146, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998).*

> 9   The "state of mind" exception to the hearsay rule has a well-established pedigree, having been discussed by the United States Supreme Court as early as 1892 in *Mutual Life Ins. Co. of N.Y. v. Hillmon, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892).* It has since been codified in both the Delaware and Federal Rules of Evidence. *See* Del. R. Evid. 803(3); *Fed. R. Evid. 803(3).* Several Courts of Appeals have found it to be "firmly rooted." *See Horton v. Allen, 370 F.3d 75, 85 (1st Cir. 2004).*

The properly admitted evidence presented at trial of Capano's controlling, manipulative, and obsessive nature was legion. As noted above, many of Fahey's out-of-court statements were introduced by stipulation in the form of Fahey's diary, Kim Lynch-Horstmann's testimony, and the emails between Fahey and Capano. Capano apparently thought some of this information would be helpful to him. Each of these sources of evidence contained both generalized comments on Capano's nature and detailed accounts of specific behavior. They painted Capano in an extremely unflattering light. Capano's negative attributes were also [*44] on prominent display in Capano's own writings from prison to MacIntyre, her teenage son, and Susan Louth, another of Capano's former mistresses. His vindictive nature was exemplified by his attempt from prison to have MacIntyre's house ransacked and burglarized, which was described in detail through properly admitted evidence. As such, the wrongly admitted evidence provided the jury with nothing that was not available from other credible, properly admitted sources. We emphasize again that the trial judge gave appropriate limiting instructions, which reduced the likelihood of any prejudice.

Capano relies on *United States v. Lopez,* in which our Court of Appeals reviewed for harmless error the ruling of the district court which it concluded had erroneously admitted hearsay at trial. *340 F.3d 169 (3d Cir. 2003).* There, the Government introduced an out-of-court statement made to a prison official by a nameless tipster that the defendant had contraband in his cell. The Court of Appeals observed that the statement was the only evidence upon which the jury could find that an "invisible, presumably disinterested witness" corroborated the government's position. In reversing the conviction, the **[*45]** Court characterized the inadmissible statement as the "cement" that held together the jury's verdict. *Lopez, 340 F.3d at 177.* Here, by contrast, the wrongly admitted evidence was almost entirely cumulative in subject matter. The improperly admitted hearsay statements did not serve to "cement" an otherwise tenuous case.

The erroneous admission of certain of Fahey's out-of-court statements under D.R.E. 803(3) did not have "a substantial and injurious effect or influence in determining the jury's verdict" under *Brecht, 507 U.S. at 631.* Thus, we will deny relief to Capano on that basis.

Capano further contends that his constitutional right of confrontation was also violated under *Roberts* by the admission of Fahey's statements to her psychotherapists under D.R.E. 803(4). While the Delaware Supreme Court concluded that Fahey's statements about past events were inadmissible under D.R.E. 803(3), it determined that they were admissible pursuant to D.R.E. 803(4) and possessed sufficient "particularized guarantees of trustworthiness" under the second *Roberts* prong to satisfy the *Confrontation Clause.*

The United States Supreme Court has held that the hearsay exception for "statements made for purposes [*46] of medical diagnosis or treatment," as embodied in the identical *Rule 803(4) of the Federal Rules of Evidence,* is firmly rooted for *Confrontation Clause* purposes. *White, 502 U.S. at 356 n.8.* While Fahey's psychiatrist, Dr. Kaye, was a physician,

Dr. Sullivan and Dr. Johnson, who also saw Fahey, were psychologists and not medical doctors. The Court has not reached the specific issue of whether *Rule 803(4)* is applicable or firmly rooted as to statements made to psychologists for purposes of diagnosis or treatment. In any event, the Court has provided ample guidance to suggest that it would not exclude such statements admitted here at least under the second *Roberts* test.

In *Idaho v. Wright,* the United States Supreme Court noted that the "particularized guarantees of trustworthiness" required for admission under the *Confrontation Clause* should be "drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *497 U.S. 805, 820, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990).* A trial court has "considerable leeway" in weighing the relevant circumstances. *Id. at 822.* The Supreme Court, by way of example, stated that "spontaneity and consistent repetition" **[*47]** and a "lack of motive to fabricate" are permissible factors to consider in examining the totality of the circumstances. *Id. at 821-22.*

The Delaware Supreme Court cited as persuasive the fact that "Fahey made the statements to her psychotherapists in a natural manner during therapy sessions," with "nothing to indicate that Fahey made the statements under suspicious circumstances or in a manner suggesting that she had sinister motives." The Court considered the "spontaneity and consistent repetition" of the statements and noted "that Fahey made nearly identical statements concerning her intentions and her emotional state to a number of her psychotherapists and friends." In view of the presence of several *Wright* factors and the considerable leeway that must be accorded the trial court, the Delaware Supreme Court's determination that Fahey's out-of-court statements to her psychotherapists satisfied the *Confrontation Clause* was not an objectively unreasonable application of clearly established United States Supreme Court precedent.

As his final argument under the *Confrontation Clause*, Capano argues that the Delaware Supreme Court erred in allowing the introduction of Fahey's statements in **[*48]** the State's case-in-chief, rather requiring their introduction to be deferred until the State's rebuttal. He maintains that such evidence is unfairly prejudicial when it is not delayed until after a defense such as accident is raised. The Delaware Supreme Court disagreed. It held that it was relevant to the State's effort to show that Fahey had sought to end her romantic relationship with Capano and that he had a motive, as a rejected lover, to kill her.

The United States Supreme Court has not addressed whether under some circumstances statements properly admitted under *Rule 803(3)* must, as a constitutional matter, be delayed by the State until it presents its rebuttal case. Further, as far as we know, no holding of any lower federal court espouses Capano's desired result. Given the complete lack of clearly established United States Supreme Court precedent supporting Capano's position, the Delaware Supreme Court's decision allowing the admission of hearsay statements under *Rule 803(3)* in the State's case-in-chief does not provide Capano with a basis for relief under *28 U.S.C. § 2254.*

In sum, Capano's right to confront the witness against him under the *Confrontation Clause* was violated **[*49]** by the improper admission of certain hearsay evidence under Rule 803(3). However, in light of the properly admitted evidence which included the voluminous stipulations as well as Fahey's trustworthy statements to her psychiatrist and two psychologists, the violation did not have "a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht, 507 U.S. at 631.* Accordingly, Capano's claim under the *Confrontation Clause* merits no relief.

V.

Capano's final claim for relief under *28 U.S.C. § 2254* challenges the prosecution's cross-examination of him at the trial concerning his post-arrest silence at his bail hearing in February, 1998. He asserts that his due process rights were violated under the *Fourteenth Amendment* to the *Constitution. U.S. Const. amend. XIV, § 1*. In *Doyle v. Ohio*, the United States Supreme Court held that "use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the *Due Process Clause of the Fourteenth Amendment*." *426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); see Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)*.

On direct examination, Capano professed that he remained silent for more than two years after [\*50] Fahey's death, including at his five-day bail hearing that began on February 2, 1998, out of a desire to protect MacIntyre and his brother Gerry. On cross-examination, the prosecutor then sought to impeach Capano on the proffered rationale. The colloquy during the trial transpired as follows:

> Q: And then February 27, 1998, after you are arrested, Debbie MacIntyre signs a cooperation agreement with the Government, right?
>
> A: Yes, she does. I didn't hear the date you said.
>
> Q: February 27, 1998?
>
> A: Yeah, I don't know if that's the date she signed. I know that's the date she went in. For all I know she had signed it the day before.
>
> Q: You kept quiet at the bail hearing which preceded this, right? There was a bail hearing in February to decide whether you would stay in jail. You never said she did it, right?

> A: I never testified.
>
> Q: But you never said it through any means. You never told your attorneys, you never did anything?
>
> A: No, I was true to my word. I was protecting her.
>
> Q: You were protecting her. February 27th she signs a cooperation agreement with the State?
>
> A: Yes.
>
> Q: And you're in jail?
>
> A: Yes.
>
> Q: You have-according to your testimony, it's been horrible conditions that you've endured in jail, [\*51] right?
>
> A: Very terrible.

Capano failed to object to this line of questioning at trial. However, he presented his claim of improper cross-examination to the Delaware Supreme Court on direct review and thus has satisfied the exhaustion requirement. *O'Sullivan, 526 U.S. at 845, 847*.

The State maintains the Delaware Supreme Court disposed of Capano's improper cross-examination claim pursuant to Delaware Supreme Court Rule 8. The State argues that this ruling constitutes an independent and adequate state ground which precludes this Court from granting federal habeas corpus relief. *Coleman, 501 U.S. at 729*. Rule 8 provides:

> Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so

presented.

The Delaware Supreme Court has interpreted the "interests of justice exception" contained in Rule 8 to call for "plain error" review before the Court will excuse default in failing to raise an issue at the trial level. "[T]he error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process." [*52] *Wainwright v. State, 504 A.2d 1096, 1100 (Del. 1986).* Our Court of Appeals has recently held that a finding of no plain error pursuant to Delaware Supreme Court Rule 8 when the issue has not been preserved below constitutes an independent and adequate state ground which forecloses federal review under *28 U.S.C. § 2254. Campbell v. Burris, 515 F.3d 172, 182 (3d Cir. 2008).*

The Delaware Supreme Court did not specifically reference Rule 8 in deciding on direct appeal Capano's claimed violation of his right to post-arrest silence. Nonetheless, the heading in the relevant section of its voluminous opinion was "Questions Concerning Post-Arrest Silence - No Plain Error." *Capano v. State, 781 A.2d 556, 647 (Del. 2001).* The Court explained that "[b]ecause no objection was raised at trial, we review this claim for plain error." *Id.* It immediately thereafter cited its decision in *Wainwright,* the case in which it announced that Rule 8 requires "plain error" review where the appellant failed to object at trial.

While noting Capano's waiver at trial, the Court necessarily proceeded to delve into the merits. Otherwise, it would not have been able to decide if the Superior Court judge had committed [*53] plain error. There is no doubt that the Delaware Supreme Court reviewed Capano's claim for plain error and found none. Such review constitutes an independent and adequate state ground for denial of relief. *Campbell, 515 F.3d at 182.* Consequently, we are precluded from reviewing this claim in a

collateral proceeding under *§ 2254* unless Capano establishes cause for his procedural default and actual prejudice or shows that a miscarriage of justice will result if we refuse to hear his claim. *See Coleman, 501 U.S. at 750.* Capano has not alleged cause for his procedural default and is unable to demonstrate that a miscarriage of justice will result from our refusal to hear his claim.

Even if we may review the substance of Capano's claim, we find it to be meritless. The United States Supreme Court in *Doyle* made clear that cross-examination as to post-arrest silence is improper only where it is used to "impeach the exculpatory story." *426 U.S. at 619 n.11.* The Court explained that the use of a defendant's post-arrest silence to impeach an exculpatory story disclosed shortly before or at trial would be "fundamentally unfair because Miranda warnings inform a person of his right to remain silent [*54] and assure him, at least implicitly, that his silence will not be used against him." *Anderson v. Charles, 447 U.S. 404, 407-08, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980).* This rationale is not applicable here.

In this case, Capano opened the door to a discussion of his post-arrest silence not only by repeatedly referencing it on his direct examination but by making it a keystone of his defense. He stressed that the motivation for his post-arrest silence, including his silence at his February, 1998 bail hearing, was to protect MacIntyre from suffering legal repercussions for her role in Fahey's death. Yet, Capano had also stated on direct examination that he was enormously disappointed by MacIntyre's failure to testify at the bail hearing, particularly after he had given her so many detailed instructions to follow at that proceeding. He further described a dramatic and negative shift in the tone of MacIntyre's communications to him beginning on January 28, 1998, a few days before the bail hearing took place.

The State on cross-examination impeached the credibility of Capano's proffered explanation for his continued silence at the bail

hearing when his relationship with MacIntyre had noticeably deteriorated by that time [*55] and he knew she was no longer willing to be a witness on his behalf. Under the circumstances, the State's questioning was in no way "fundamentally unfair" and did not infringe Capano's right to remain silent after his arrest. We conclude that the State's limited cross-examination of Capano regarding his post-arrest silence did not result in a constitutional violation.

In any event, even if there were constitutional error, it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht, 507 U.S. at 631*. Capano is not entitled to relief on his *Doyle* claim.

## VI.

For the reasons discussed above, Thomas J. Capano has not demonstrated that he is entitled to relief. Accordingly, we will deny his petition for a writ of habeas corpus under *28 U.S.C. § 2254*. We will not issue a certificate of appealability.

## ORDER

AND NOW, this 15th day of April, 2008, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

(1) the petition of Thomas J. Capano for a Writ of Habeas Corpus under *28 U.S.C. § 2254* is DENIED; and

(2) a certificate of appealability is not issued.

BY THE COURT:

/s/ Harvey Bartle III

HARVEY BARTLE III C.J.

SITTING BY DESIGNATION

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2008, I served a copy of the foregoing **Combined Petition for Panel Rehearing and Rehearing en banc** on the following by First Class mail, postage prepaid.

Elizabeth R. McFarlan, Esquire
Department of Justice
820 N. French Street
Wilmington, DE 19801

_Joseph M Bernst_

JOSEPH M. BERNSTEIN (Bar #780)
800 N. King Street - Suite 303
Wilmington, DE 19801
302-656-9850
E-mail: jmbern001@comcast.net